Larry **ROCKEFELLER**, et al., Plaintiffs,

and

Steve **Forbes**, et al., Plaintiffs–Intervenors,

v.

William **POWERS**, et al., Defendants.

No. 95 CV 4478.

United States District Court, E.D. New York.

Feb. 21, 1996.

---

Richard D. Emery, New York City, Burt Neuborne, The Democracy Project, New York City, for Plaintiffs.

Thomas W. Kirby, Wiley, Rein & Fielding, Washington, D.C., Joel Graber, Office of the Attorney General, State of New York, New York City, Peter S. Kosinski, New York State Board of Elections, Albany, New York, Kevin C. Reilly, Office of the Attorney General, State of New York, New York City, Robert J. Cimino, Suffolk County Attorney by Robert H. Cabble, Ass't County Attorney, Hauppauge, New York, Nancy Ledy–Gurren, Ledy–Gurren & Blumenstock, L.L.P., New York City, for Defendants.

## MEMORANDUM & ORDER

KORMAN, District Judge.

This case is before me on a renewed motion for a preliminary injunction following the completion of the petitioning phase of the 1996 New York Republican primary to select delegates to the Republican National Convention. The complaint and application for preliminary relief were originally filed on November 13, 1995, just prior to the commencement of the "petitioning phase" of the primary. At that time, plaintiffs contended that the ballot access signature requirements adopted by New York State and the New York Republican State Committee violated the Equal Protection Clause because the burdens on ballot access they placed on delegate candidates in congressional districts with relatively few Republicans were substantially higher than the burdens they placed on districts with many Republicans. Although plaintiffs also alleged that the ballot access requirements constituted an undue burden, I did not reach that prong of their complaint. I addressed only their Equal Protection Clause claims and granted preliminary relief that would have reduced the signature requirements in half of the districts. *See Rockefeller v. Powers*, 909 F.Supp. 863 (E.D.N.Y. 1995).

In so doing, I observed that the ballot access requirements adopted by New York State and the Republican State Committee could not be sustained because, as applied, they unreasonably discriminated based on the number of Republicans enrolled in a congressional district:

> In those districts in which it is easier to find a needle in haystack than an enrolled Republican, they require signatures from a percentage of enrolled Republicans three times greater than is required in the large majority of congressional districts, where the number of enrolled Republicans approaches or substantially exceeds 100,000 and the difficulty of finding them is greatly reduced.

*Rockefeller v. Powers*, 909 F.Supp. at 868 (E.D.N.Y.1995). Moreover, after examining the rationale behind this apparently discriminatory scheme I concluded:

The only justification appears to be a desire to increase the advantage already enjoyed by the presidential candidate favored by the Party organization. The favored candidate has the benefit of an in-place organization that can gather the required signatures for delegates with relative ease. Differences in the burdens imposed in different districts are unlikely to have any significant practical effect on the ability of delegates pledged to the favored candidate to obtain the requisite number of signatures. In contrast, such differences may have a substantial impact on candidates who are independent of the Party organization. Because of shortages of time and resources, these candidates, engaging in national campaigns, may be forced to forego petitioning in many small districts and focus only on districts, or other states, where ballot access is relatively easy. In the congressional districts in New York with the fewest Republicans, the Party's candidate will be locked in and the voters who would have voted for other candidates will be locked out.

*Id.*

The Second Circuit reversed, in part because it did not agree with plaintiffs' "empirical claim that the [ballot signature requirement] establishes a likelihood of *significantly reduced* choice in districts with fewer Republicans compared to more heavily Republican districts." *Rockefeller v. Powers*, 74 F.3d 1367, 1377 (2d Cir., Dec. 21, 1995). Based on its own review of plaintiffs' affidavits, which detailed the results of the petitioning phase in the 1988 New York Republican Party primary, the Court of Appeals concluded:

There does appear to be a correlation between (a) the districts with more than two candidates on the ballot and (b) the number of registered Republicans in those districts; none of the fifteen least Republican districts had more than two candidates on the ballot. But we think that the difference between three slates and two slates is decidedly less significant than the difference between two slates and one slate. The contention that the fundamental right to vote is infringed in single-candidate districts (where there is arguably no choice) is a very different contention (and a much stronger one) than the contention that the fundamental right to vote is infringed in districts with two candidates on the ballot. *Id.* at 1379.

The results of the 1995–96 petitioning phase show the same correlation that the Court of Appeals saw in the 1988 data. As in 1988, the choice of ballot access restrictions that require slates of delegates pledged to a particular candidate to obtain signatures from 5% or 1250 of the enrolled Republicans in each district was made by the Republican State Committee from two choices offered by New York law. *See Rockefeller v. Powers*, 74 F.3d at 1370 (2d Cir.1995). Delegate slates committed to Senator Robert Dole, the candidate endorsed by the Committee and favored by the Party apparatus, are on the ballot in every district. In sixteen of the seventeen most densely Republican districts, both Steve Forbes and Patrick Buchanan slates also attempted to get on the ballot. In eleven of these districts both groups succeeded and the voters will, therefore, have a choice of three candidates. In four of them, the voters' only choice will be between Senator Dole and Mr. Forbes and in one, the 24th, only Senator Dole will be on the ballot.

The situation in the fourteen districts with the fewest Republicans is dramatically different. In those districts, both challengers to the Party favorite attempted to get on the ballot in the same districts only eight times and in only one district did they both succeed. After court challenges, voters in eleven of the fourteen least densely Republican districts will have a choice between Senator Dole and only one other candidate and in two, the 9th and 15th, only Senator Dole will be on the ballot.

The evidence of the burden imposed by this statutory scheme is even more telling if one looks behind the numbers. Of the candidates who accept public financing under the Federal Election Campaign Act of 1971, only one candidate, other than the Republican State Committee's favored candidate, even attempted to devote the resources necessary to place delegate slates on the ballot. This candidate, Patrick Buchanan, made the effort in twenty-four of the thirty-one districts.

Nevertheless, he was ultimately successful in only thirteen districts, ten of which are high-density districts. The other candidate who challenged the candidate favored by the Republican State Committee is Mr. Forbes, who was not bound by the campaign finance laws. Had Mr. Forbes, whom the defendants characterize as "highly atypical in ways that the first amendment does not particularly favor," (Defs.' Opp. to Mot. for Prelim.Inj. at 13), not entered the race, the effect of New York's ballot access scheme would have been to deny voters in the eleven least densely Republican districts (and eighteen of all thirty-one districts) any choice while permitting a choice of two candidates in thirteen of the twenty most densely Republican districts.[1]

That the Forbes campaign's petition drive was far more potent than could be expected from candidates lacking his huge personal fortune is demonstrated by the approaches taken by the other major candidates who were not favored by the Republican State Committee. This year, the only other such candidate who made an effort to get on the ballot in New York was Patrick Buchanan, whose candidacy derived a significant advantage due to extraordinary media exposure unrelated to a career in public office. *See* A.M. Rosenthal, *Making of Buchanan,* N.Y. Times, Feb. 16, 1996, at A33. All other Republican candidates in a relatively large field that included the former Governor of Tennessee and Secretary of Education, Lamar Alexander, Senator Richard Lugar, and Senator Phil Gramm, opted not to compete in New York. The plaintiffs have provided an affidavit from the chairman of Senator Gramm's campaign, Charles Black, averring that Senator Gramm chose to forego New York after estimating that even a mildly successful petition drive would have cost the campaign one million dollars. (Black Aff. ¶ 22.) The affidavit states that "[a]bsent New York's arcane and burdensome ballot access requirements and procedures, I would have counseled the Campaign to compete in the New York Primary. However, it is currently prohibitive for Non-favored Candidates to compete in New York. For these reasons, the [Gramm] Campaign elected not to compete in New York." (Black Aff. ¶ 24.)

While the Gramm campaign and others chose to forego New York altogether, the thrust of Mr. Black's affidavit is similar to the affidavits submitted on behalf of Senator Dole and Pat Robertson in the 1988 legal challenge to New York's ballot access restrictions. Senator Dole and Pat Robertson did not entirely forego the 1988 New York Republican primary. Nevertheless, they did not attempt to get on the ballot in all thirty-four of the congressional districts and were not successful in many in which they devoted considerable resources to the effort.[2] Mr. Pepe, the executive director of the Dole campaign in 1988, wrote that the New York ballot access scheme at issue here

> imposed considerable burdens on the state campaign. Despite the labors of approximately 600 members of the Dole campaign staff, both paid and volunteer, across the state, and an expenditure of approximately $90,000 to accomplish the task, the Dole campaign was able to file petitions for slates of three delegate candidates for only 22 of the state's 34 congressional districts.

> . . . .

> Given the staffing realities and the strictures of New York law, the Dole campaign made the difficult decision to devote its resources and energies to filing petitions in 22 congressional districts, identified as ones in which the campaign was run up, staffed and organized at local levels to attempt the necessary petition drive to place delegate candidates on the ballot. Thus certain congressional districts effectively had to be sacrificed from the ballot, given the finite numbers of people, funds, expertise and time available to conduct the necessary petition drives.

1. A chart describing the results of the 1995–96 petitioning phase is annexed hereto as Appendix A. The chart shows that in none of the 11 districts with a signature requirement of more than 1.54% will voters have a choice of more than two candidates.

2. The number of districts has since been reduced to 31 as a result of the 1990 census.

*Mahon v. Abrams,* No. 88 Civ. 1745, at 6–7 (S.D.N.Y. Mar. 21, 1988) (Sand, J.), *aff'd without op.,* 847 F.2d 835 (2d Cir.1988). "A substantially similar affidavit [was] furnished in support of the application by Henry H. Hewes, executive director of the Americans for [Pat] Robertson campaign in the State of New York." *Id.*

A Dole slate ultimately appeared on the 1988 ballot in only eight districts and a Pat Robertson slate in only eleven. In their failure, Senator Dole and Mr. Robertson were not alone. Jack Kemp, who was an effective and widely known member of Congress from New York and who had an upstate political base, obtained a place on the ballot in fifteen of the thirty-four congressional districts. The only candidate with delegate slates on the ballot in every district was George Bush, the candidate favored by the Republican State Committee.[3]

Notwithstanding the compelling evidence that, at the very least, the statutory scheme in New York burdens the right to vote in the congressional districts with the fewest enrolled Republicans, the Court of Appeals decided, for a variety of reasons, that plaintiffs were not entitled to a preliminary injunction on the grounds that the statutory scheme at issue offended the Equal Protection Clause. While the outcome of the 1995–96 petitioning process provides further support for plaintiffs' equal protection argument, I decline to revisit that issue here because the premises on which the Court of Appeals based its holding require the same result.

■ The issue that I did not address and the issue that the Court of Appeals expressly left open, *see Rockefeller v. Powers,* 74 F.3d at 1378 n. 17 (2d Cir.1995), is whether the New York ballot access rules constitute an undue burden on the right to vote in violation of the First and Fourteenth Amendments. This is the argument plaintiffs now press in their renewed application for a preliminary injunction and which I find merits the relief requested.

*Discussion*

The Supreme Court has held that "the right to vote is 'heavily burdened' if that vote may be cast only for one of two candidates in a primary election at a time when other candidates are clamoring for a place on the ballot." *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974). The foregoing discussion has shown that the statutory ballot access scheme in New York predictably and consistently operates to "heavily burden" the right to vote of Republican primary voters in a significant number of congressional districts. The issue here is whether it does so "unduly." As Chief Justice Burger observed in *Lubin:*

> It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues. This does not mean every voter can be assured that a candidate to his liking will be on the ballot, but that the process of qualifying candidates for a place on the ballot may not constitutionally be measured solely in dollars.

*Id.* While *Lubin* dealt with ballot access that was impermissibly burdened by filing fees, it is clear that signature and other requirements may likewise impermissibly burden voter choice.

■ Analysis of the validity of ballot access signature requirements to determine whether they unduly burden the right to vote proceeds in three steps:

3. The 1988 results I refer to in the text are drawn from an official listing provided by defendant New York State Board of Elections. (*See* letter from State Board of Elections of 2/22/96.) The official data for the 15th, 27th, 28th, 29th, and 34th districts differ from the data in the table printed in the margin of the Court of Appeals's opinion in this case. *See Rockefeller v. Powers,* 74 F.3d at 1373 n. 7 (2d Cir., Dec. 21, 1995). The Court of Appeals's decision indicates that it, in turn, had relied on a document in plaintiffs' appendix. *See id.* at 1379 n. 20. One of the principal differences between the Court of Appeals's data and the official data relates to the existence of three districts where no candidates were on the ballot. The Court of Appeals found it significant that "the only three districts in which no candidate qualified for the ballot were heavily Republican...." *Id.* at 1373. Contrary to this finding, the official listings indicate that George Bush and Pat Robertson were both on the ballot in two of these districts and that Mr. Bush, Mr. Robertson and Mr. Dole were all on the ballot in the third.

[A reviewing court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all of these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983) (internal citation omitted). The Supreme Court has recently explained how these factors should be balanced:

Under this standard the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, non-discriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

*Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (internal citations omitted).

At the outset, it should be noted that a presidential primary requires a kind of campaign that is very different from an ordinary campaign for local office. In a national presidential campaign, ballot access restrictions that require enormous outlays of money and manpower will lead candidates to concentrate their resources in other states where the return on their investment, measured in terms of potential delegates and national exposure, will be greater per dollar spent. Thus, to prevent candidates from competing in a certain state, the state legislature need not adopt access restrictions that are, in the abstract, insurmountable. Instead, it need only adopt restrictions that are substantially more burdensome than those adopted in other states. This appears to be the approach taken in New York, which has the most restrictive ballot access signature requirements of any state that elects delegates in a primary.

The cornerstone of New York's ballot access scheme is the basic signature requirement. To get on the ballot for the Republican presidential primary in any one of New York's thirty-one congressional districts, delegates supporting a candidate for President must obtain signatures from 5% or 1250, whichever is less, of the enrolled Republican voters in the district. The total number of signatures necessary to put a candidate's name on the ballot in all thirty-one districts is approximately 37,000. Because signatures must be gathered in every district, presidential candidates who do not enjoy the support of the existing Party apparatus must create far-flung organizations that reach to every corner of New York State.

The first indication that a 5% or 1250 per district figure is unduly harsh is provided by the evidence of other states' practices.[4] The large majority of states are satisfied with no impediments to ballot access or impose only a small fee. The only state with ballot access restrictions remotely comparable to New York's is Indiana, which requires 5,000 signatures statewide, including 500 from each of its ten congressional districts.[5] If this 500–signatures–per–district scheme were imple-

---

4. Among the guideposts the Supreme Court has used to determine whether a burden on ballot access is "undue" are the burdens imposed in other states. *See, e.g., Storer v. Brown,* 415 U.S. 724, 739, 94 S.Ct. 1274, 1283, 39 L.Ed.2d 714 (1974); *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971).

5. A state-by-state list of ballot access requirements compiled by plaintiffs from Karen M. Markin, *Ballot Access 3: For Presidential Candidates* (Nat'l Clearinghouse on Elec. Admin., Fed. Elec. Comm'n, Wash. D.C.) July 1995, is annexed hereto as Appendix B.

mented in New York, the total number of signatures required statewide would be slashed by approximately 60% and by the same 60% in all but six districts, where the number of signatures would still be significantly reduced, but by a smaller amount.

Beyond the numerical requirements, New York imposes other constraints that make compliance with these requirements more difficult. *See Schulz v. Williams*, 44 F.3d 48, 56 (2d Cir.1994) ("[W]e proceed by the 'totality approach' and consider the alleged burden imposed by the challenged provision in light of the state's overall election scheme."). New York law prohibits a person from signing petitions for more than one candidate and invalidates any signatures given after the first. *See* N.Y. Elec.Law § 6–134(5). As the petitioning phase proceeds, the number of people still available to sign petitions decreases and the difficulty in finding them increases. The thirty-seven day petition-gathering period is, on its face, relatively short and, making matters worse, the petitioning phase now falls during the period from Thanksgiving to just after New Year's Day. As a result, petition gatherers were hampered by holidays and vacations, short days, and winter storms.

In addition, New York law will invalidate a signature for a host of defects that have nothing to do with whether the person who signed the petition was qualified to do so. For example, signatures can be invalidated for failure to comply with strict rules regulating who may witness a signature. *See* N.Y.

Elec.Law § 6–132. The witness must be a registered Republican voter from within the district or a notary public or Commissioner of Deeds. Requiring that the witness be a Commissioner of Deeds, specially qualified to witness a signature, or a Republican residing within the district, who has no such qualification, manifests two distinct rationales, if any, and therefore suggests that neither requirement performs an essential function.[6]

New York also requires each voter's signature to be accompanied, not only by the signer's address, but also by his or her election district number and, in New York City and Nassau County, his or her Assembly district number.[7] N.Y. Elec.Law § 6–130. New York City and Nassau County already have computer systems that make this requirement obsolete, and probably unconstitutional as applied there, and the expenditure of $12,000 could bring the State Board of Elections into the computer age. *See Schulz*, 44 F.3d at 59. Nevertheless, it is another burden that must be borne. Because most voters do not know what district they are in, the campaign must fill in the information. Once this is accomplished, the petition must be assembled in volumes, each accompanied by the appropriate summary sheet conforming to yet another list of technical requirements. *See* N.Y. Elec.Law § 6–134(2). The failure to comply with any of the requirements may trigger penalty provisions that invalidate substantial numbers of perfectly valid signatures.[8]

---

**6.** Strict enforcement of this witness qualification provision is responsible for knocking Mr. Forbes off the ballot in the 9th district. Of the 1922 signatures submitted on behalf of Forbes delegates there, 1063 were invalidated because they had been collected between November 28 and December 4 by "unqualified" witnesses. The witnesses had taken and passed the required test, paid the required filing fee, and been approved by the New York City Council for the office of Commissioner of Deeds, essentially the City's version of a notary public, but did not file their oaths of office with the City until December 4.

**7.** Of the 1902 signatures gathered by the Forbes campaign in the 24th district, 257 were invalidated for stating an incorrect election district. The election district provided with those signatures was the pre–1995 election district, which had changed as a result of reapportionment. Al-

though the Board of Elections found "that the claim of confusion due to reapportionment is reasonable, and thus that the old election districts may be accepted on the petition sheets in question," the New York State courts held that this "reasonable confusion" finding was erroneous and invalidated the signatures. This, along with 505 other invalidations on other grounds, left the Forbes delegates with an insufficient number of signatures to qualify for ballot access.

**8.** In the 18th district, the Forbes campaign was severely penalized for an alleged overstatement on the summary sheet it provided for a set of volumes. The summary sheet reflected seven volumes but the Board of Elections apparently received only six and, therefore, found that the summary sheet overstated the number of signatures submitted. The original seventh volume was never found, but the Forbes campaign did

While each of these cumbersome and arcane rules alone may not be unduly burdensome, their net effect is to increase substantially the number of otherwise valid signatures a candidate needs to obtain to anticipate the inevitable challenges from the favored candidate of the Republican State Committee. The affidavit submitted by the Forbes campaign indicates that, at the very least, 140% of the statutorily prescribed number of signatures must be obtained in each district. (Slater Aff. ¶ 16.) The Republican State Committee Chairman, William Powers, however, suggests, that one of the reasons Mr. Forbes failed to secure a place on the ballot in the four districts where challenges succeeded in knocking his delegates off the ballot is that the Forbes campaign *"only* had a goal of 140% of the signature requirement." (Powers Aff. ¶ 21) (emphasis added.) Accordingly, the actual number of valid signatures necessary to place a slate on the ballot may significantly exceed 140% of the nominal requirement. This means that in districts where 1250 signatures are nominally required by law, candidates not supported by the Republican State Committee must obtain approximately 2000 signatures and in those where the requirement is nominally 5% it is actually between 7% and 8%. "This would be in excess, percentagewise, of anything the Court has approved to date as a precondition to an independent's securing a place on the ballot and in excess of the 5% which we said in *Jenness* [*v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971),] was higher than the requirement imposed by most state election codes." *Storer v. Brown,* 415 U.S. 724, 739, 94 S.Ct. 1274, 1283, 39 L.Ed.2d 714 (1974); *see also Socialist Labor Party v. Rhodes,* 318 F.Supp. 1262, 1268 (S.D.Ohio 1970) ("Rather than requiring a showing of voter interest, the seven percent requirement prohibits third parties from participating in elections."), *aff'd,* 409 U.S. 942, 93 S.Ct. 282, 34 L.Ed.2d 214 (1972).

The success of Mr. Forbes in gaining access to the ballot in twenty-seven of thirty-one districts does not show, as the Chairman of the Republican State Committee suggests, that "the New York Primary system does not unfairly exclude candidates." (Powers Aff. ¶ 21.) If Mr. Forbes was more successful than any other "independent" Republican candidate in recent history, there is certainly a good explanation. Mr. Forbes was willing to spend his own substantial fortune and, therefore, was unfettered by campaign financing laws. He spent one million dollars on petition gathering in New York. (Slater Aff. at ¶ 10.) This amount dwarfs by a factor of ten the amount spent in 1988 by Senator Dole, who was, without question, a bona fide candidate.

The Forbes campaign estimates that its petition drive consumed 37,500 manhours, not including any time spent by Forbes's legal team working on administrative and judicial challenges. (Slater Aff. ¶ 14.) The campaign hired more than 320 full- and part-time petition circulators, which does not include lawyers, consultants and other staff. (Slater Aff. ¶ 10; Neary Aff. ¶ 9.) Ordinary circulators were paid $10 per hour and Commissioners of Deeds were paid $20 per hour. (Neary Aff. ¶ 10.) Each circulator received two hours of training on the technical requirements of the New York Election Law and how to use "walking lists." (Neary Aff. ¶ 18.) These walking lists, giving names and addresses of all registered Republicans, were purchased from the Board of Elections. (Slater Aff. ¶ 10.) In order to be of use in the field, the raw data in these lists were first converted by paid computer consultants into an accessible format. (Slater Aff. ¶ 10.) Nonetheless, their utility was limited by inaccuracies in 30–50% of the data. (Neary Aff. ¶ 21(a).) With this effort, the Forbes campaign managed to accumulate, prior to any legal challenges, sufficient signatures to meet the numerical requirements in all thirty-one districts and still was knocked off the ballot in over 10% of the districts.[9]

produce a photocopy of the entire volume. Nonetheless, pursuant to N.Y. Election Law § 6–134, the Board did not count the 337 signatures and invalidated an additional 337 signatures as a penalty. The number of remaining signatures

was 140 shy of the 1250 required for ballot access.

9. The number of successful challenges would have been higher had challenges to the Forbes

The petition drive orchestrated by Mr. Forbes, rather than proving that "the New York Primary system does not unfairly exclude candidates," (Powers Aff. ¶ 21), shows just the opposite. It demonstrates that without the support of the New York Republican State Committee, only the most atypical of candidates, one with unlimited financial resources, can come even close to replicating the unique ability of the favored candidate to obtain ballot access for delegates pledged to him or her. Indeed, defendant Powers's affidavit only emphasizes this point. Mr. Powers cites Patrick Buchanan as an example of "other successful candidates who built their petition effort around highly motivated volunteers" committed to the candidate's ideas:

> Patrick Buchanan's campaign identified supporters who were community leaders to serve as delegate candidates. Generally, it was these delegates themselves, or family and friends they recruited, who went to their neighbors and to fellow community activists for the requisite signatures. The Buchanan Campaign demonstrates that a candidate with limited resources, but who organizes a dedicated group of volunteers, can get his or [sic] delegate slates on the ballot in New York.

(Powers Aff. ¶ 13.) Nevertheless, Mr. Powers is forced to concede that "[d]elegate candidates supporting Mr. Buchanan are on the ballot in 12 districts," only half the number in which he sought access. *Id.*[10] Playing by the rules of the Federal Election Campaign Act of 1971, Mr. Buchanan's "successful" campaign in New York, which was "grass roots," will enable him to compete for little more than a third of the delegates to be elected in the New York primary. This experience mimics that of Senator Dole in 1988. Senator Dole was then the Senate Minority Leader, he had been the Republican vice-presidential nominee in 1976, and he had "been historically supportive of local Republi-

can candidates in New York and supportive of Party-building activities," (Powers Aff. ¶ 27). Nevertheless, without Mr. Forbes's money or the support of the Republican State Committee, he managed to get slates on the ballot in only eight of the thirty-four congressional districts.

The rarity of a candidate who is willing and able to target all or almost all of the districts in New York is what is most troubling. History shows that the candidate who is not favored by the Party will *never* target every district, unless he is a Steve Forbes. Even if he is a Steve Forbes, he will not succeed in gaining access to the ballot in every district. By itself, the inability of any challenger to accomplish this task means that, even under the best of circumstances, voters in several districts will inevitably be left without a choice in a state-sponsored presidential primary.[11] More importantly, the inability to compete statewide with the Party favorite has led viable challengers not to compete in *any* district. If the New York districts are indistinguishable from thirty-one separate states, each with only one congressional district and, therefore, only three delegates at stake, this behavior on the part of viable presidential campaigns is irrational. Just because a candidate has little chance of success in one single-district state would not provide a reason not to compete in a neighboring single-district state.

Nonetheless, there is no evidence that a candidate has ever attempted to get on the ballot in only a single New York district. This year, only candidates who could attempt to get on the ballot in at least twenty-four districts and hope to succeed in half of those chose to compete in New York. This suggests that the ante to enter the race in New York is between 15,000 and 30,000 signatures. Anyone who wants to play with less must, and always does, go somewhere else.

---

slates in six New York City districts not been dismissed because the challengers failed to provide the addresses of the delegates on the challenged slates.

**10.** On February 16, 1996, two days after Mr. Powers signed his affidavit, the Appellate Division ordered the Buchanan slate placed on the ballot in the 30th congressional district, raising

to 13 the number of districts with Buchanan slates on the ballot.

**11.** Nor is there evidence that suggests that delegate slates without financial and technical support from a candidate have been able to make the concerted effort necessary to organize a petition drive and guide it past logistical and legal challenges through to its successful completion.

This high cost of entry makes the burden in every district in New York severe, even where the signature requirement in isolation is not very difficult to satisfy.

There is, to be sure, language in the opinion of the Court of Appeals that supports the conclusion that what will take place on March 7, 1996, is thirty-one separate primaries coincidentally occurring within the geographical boundaries of the State of New York. *See Rockefeller v. Powers,* 74 F.3d at 1379–81 (2d Cir.1995). The Republican State Committee does not view the New York Primary in this way, (*see* Powers Aff. ¶ 6–7), and the language that supports this view cannot be divorced from the equal protection analysis of which it is a part. The Court of Appeals suggested that the burdens in each congressional district in New York State could not be compared for purposes of the Equal Protection Clause, but never suggested that the burden in all thirty-one districts, which a presidential candidate must confront simultaneously, could not be taken together for purposes of an undue burden analysis. *Cf. Anderson v. Celebrezze,* 460 U.S. 780, 795, 103 S.Ct. 1564, 1573, 75 L.Ed.2d 547 (1983) ("[I]n a Presidential election a State's enforcement of more stringent ballot access requirements ... has an impact beyond it own borders.").

Having assessed the burden and found it a heavy one for candidates, delegates, and voters alike, I now turn to the state's interest in imposing such heavy restrictions on ballot access. The alleged justification here is the same as in other ballot access cases, namely, "the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process." *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). The New York Legislature, however, has made it plain that New York's interest in limiting ballot access to those candidates who can demonstrate a modicum of support is satisfied by a 0.5% or 1000 requirement,[12] which is the alternative to the 5% or 1250 scheme that would have satisfied the Legislature had it been selected by the Republican State Committee. *See* 1995 N.Y.Laws Ch. 586. This demonstrates

that New York State has no compelling interest in a more restrictive rule than 0.5% per congressional district.

While the Legislature has offered each political party the option of which alternative to choose, as has been the practice in recent presidential election years, the choices merely *codify each party's preferred method of ballot access for its primary.* What appear to be the options from which the parties may choose are in fact the choices they have already made. The option requiring 0.5% or 1000 is the one requested by the Democratic Party and the option requiring 5% or 1250 is the one requested by the Republican Party. (Powers Aff. ¶ 27) ("New York has merely acquiesced in a choice the [Republican] Party made."). Nevertheless, this choice does not necessarily reflect a legitimate state interest entitled to special deference. In *Anderson,* the Supreme Court observed that, notwithstanding its prior recognition "of the State's interest in preventing 'splintered parties and unrestrained factionalism' ... we did not suggest that a political party could invoke the powers of the State to assure monolithic control over its own members and supporters." *Anderson,* 460 U.S. at 803, 103 S.Ct. at 1577. In a footnote to this text, the Supreme Court observed in language particularly apposite here that, "[e]ven though the drafting of election laws is no doubt largely the handiwork of the major parties that are dominant in state legislatures, it does not follow that the particular interests of the major parties can automatically be characterized as legitimate state interests." *Id.* at 803 n. 30, 103 S.Ct. at 1578 n. 30.

The Republican State Committee in New York endorsed Senator Dole and "the vast majority of State Committee officials and workers support Bob Dole." (Powers Aff. ¶ 26.) The same Republican State Committee, in its capacity as a state actor, selected a ballot access rule far exceeding the minimum acceptable to New York State. The rule the Committee chose consistently and decisively advantages the candidate it supports and discourages and disadvantages the candidates it has rejected. The desire of the Republican State Committee to choose rules that give its

---

**12.** In no district, however, is 0.5% of the number of enrolled Republicans more than 1000.

favored candidate the kind of advantage reflected by the record here, while entirely understandable, cannot be "characterized as a legitimate state interest."

In sum, the New York scheme fails to pass the simple, sensible test the Supreme Court offered in *Storer v. Brown* as a guide to district court judges who must address "the inevitable question for judgment," *Storer v. Brown,* 415 U.S. 724, 742, 94 S.Ct. 1274, 1285, 39 L.Ed.2d 714 (1974), in an area that "provides no litmus-paper test," *id.* at 730, 94 S.Ct. at 1279:

> [C]ould a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?

*Id.* at 742, 94 S.Ct. at 1285. The answer is that, in some districts, in some years, a candidate other than the favored candidate could. Indeed there will always be a candidate, almost always an atypical one, who, because of fame and fortune or a political base within New York, will prevent the Republican State Committee from holding a primary without any contests in all thirty-one districts. Nevertheless, there will always be a significant number of districts without any contest, where the "fundamental right to vote is infringed," *Rockefeller v. Powers,* 74 F.3d at 1379 (2d Cir.1995), and an even greater number of districts with a very limited choice, where the right to vote is "heavily burdened," *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974). Such a scheme, not justified by any sufficiently compelling state interest, is unconstitutional.

The defendants, however, argue that, even if plaintiffs are likely to succeed in their constitutional challenge, they are not entitled to the preliminary injunctive relief they seek. Specifically, relying on Judge Sand's opinion in *Mahon v. Abrams,* No. 88 Civ. 1745 (S.D.N.Y. Mar. 21, 1988), *aff'd without op.,* 847 F.2d 835 (2d Cir.1988), defendants allege that plaintiffs' request for relief comes too late. This claim fails for several reasons. In *Mahon,* plaintiffs in the fifteen congressional districts in which George Bush, the candidate favored by the Republican State Committee,

was the only candidate on the ballot sought to have slates of delegates pledged to Senator Dole and Pat Robertson placed on the ballot. In dealing with the defendants' objections to the delay in seeking preliminary injunctive relief, Judge Sand denied "the motion to dismiss as to laches." *Id.* at 12. Nevertheless, he found that "timing consideration tilt[ed] the balance ... overwhelmingly in favor of the defendants," *id.,* because it would be possible to grant the requested relief only "if one were to eliminate entirely the requirement of any petitions or signatures for the Dole–Robertson slates." *Id.* at 12–13. This result, he concluded, "would be exceedingly unfair to a candidate who engaged in the petition signature process, and would deprive the state of the valid reasons which a state has for requiring some showing of local support for incurring the expense and time and effort of a primary campaign." *Id.* at 13. This consideration is not implicated by the relief sought here.

I have before me voters from four districts whose application to intervene I have granted. There is only one slate on the ballot in three of these districts and a choice between only two slates in the fourth. These voters ask for the opportunity to vote for Mr. Forbes in the New York Republican primary. Even after the challenges to his petitions in these districts were sustained, Mr. Forbes had valid signatures in each of these districts that far exceed in number the amount that would be required to satisfy the 0.5% requirement with which New York State would be satisfied. In three of the districts the number far exceeds the percentage required in the districts with the most Republicans.

There are other reasons here why timing considerations do not tip the balance against injunctive relief. The New York Legislature contemplates litigation over ballot access challenges. Indeed, it was not until last Friday, February 16, 1996, the day that the order to show cause was returnable here, that the legal challenges to the petitions filed by Mr. Forbes and Mr. Buchanan were finally resolved. These eleventh-hour legal battles necessarily mean, as testimony before Judge Sand established, "that last minute

ballot revisions are not uncommon in New York State elections...." *Id.* at 12.

These considerations aside, there are prudential and equitable considerations that tilt the balance against denying the motion because of "delay." The Republican State Committee did everything possible to frustrate a timely resolution of the anticipated legal challenges to the scheme it adopted. Although it could have done so as early as August 8, 1995, when the ballot access law was signed by Governor Pataki, the Republican State Committee waited until October 31, 1995, the last possible day, to elect the 5% or 1250 option that it had asked the Legislature to give them. No explanation has been offered for this delay, and the Republican State Committee has never denied that it was motivated by a desire to deflect for lack of ripeness any earlier legal challenges. Indeed, on appeal from the initial preliminary injunction, as late as December 21, 1995, defendants argued the controversy was still not ripe because "there is no guarantee that a change in the ballot access rule would widen [plaintiffs'] choices, particularly since the plaintiffs cannot identify candidates who have already been or definitely will be excluded by the signature requirement." *Rockefeller v. Powers,* 74 F.3d at 1375.

While this argument was rejected by the Court of Appeals, it was not altogether without merit as a prudential matter. By awaiting the outcome of the petition gathering process to press the previously (and timely) asserted claim of "undue burden," plaintiffs can now provide direct, pertinent, and fresh evidence of the effects of the statutory scheme. Moreover, by awaiting the good faith efforts of Mr. Forbes to comply with the ballot access requirements to the extent that he could, the problem that Judge Sand found particularly troubling has been avoided. Under these circumstances, the lateness of the hour should not bar relief where equitable and legal considerations render such relief appropriate.

### Conclusion

The defendants are ordered to place on the ballot in the 9th, 15th, 18th and 24th districts the names of the Forbes delegates. The order is stayed through Tuesday, February 27, 1996, the next scheduled motion day of the Court of Appeals, when defendants may seek a further stay pending appeal.

SO ORDERED.

### APPENDIX A

The following chart indicates the number and percentage of signatures required in each district and the number of candidates who succeeded in meeting the requirement. (D = Dole; F = Forbes; B = Buchanan.) The data show a correlation between the level of the signature requirement, expressed as a percentage, and the number of choices available to voters. No district with a requirement of more than 1.54% will have a choice of more than two candidates.

| CD | # /Republicans | # /Signatures | % | # /Candidates | | | |
|----|----------------|---------------|------|---|---|---|---|
| 3  | 158,097        | 1250          | .79  | 3 | D | F | B |
| 22 | 153,824        | 1250          | .81  | 3 | D | F | B |
| 27 | 148,319        | 1250          | .84  | 2 | D | F |   |
| 4  | 148,013        | 1250          | .84  | 3 | D | F | B |
| 23 | 143,555        | 1250          | .87  | 3 | D | F | B |
| 31 | 137,952        | 1250          | .91  | 3 | D | F | B |
| 24 | 136,788        | 1250          | .91  | 1 | D |   |   |
| 1  | 129,111        | 1250          | .97  | 3 | D | F | B |
| 25 | 124,260        | 1250          | 1.01 | 3 | D | F | B |
| 26 | 116,360        | 1250          | 1.07 | 2 | D | F |   |
| 19 | 114,008        | 1250          | 1.10 | 2 | D | F |   |
| 29 | 113,561        | 1250          | 1.10 | 3 | D | F | B |
| 28 | 112,797        | 1250          | 1.11 | 3 | D | F | B |
| 2  | 112,442        | 1250          | 1.11 | 2 | D | F |   |
| 20 | 102,232        | 1250          | 1.22 | 2 | D | F |   |

| CD | # /Republicans | # /Signatures | % | # /Candidates | | |
|----|----|----|----|----|----|----|
| 13 | 88,350 | 1250 | 1.41 | 3 | D F B | |
| 21 | 86,470 | 1250 | 1.45 | 3 | D F B | |
| 5 | 85,213 | 1250 | 1.47 | 2 | D F | |
| 18 | 85,062 | 1250 | 1.47 | 2 | D B | |
| 30 | 80,970 | 1250 | 1.54 | 2 | D F B | |
| 14 | 52,555 | 1250 | 2.38 | 2 | D F | |
| 9 | 52,511 | 1250 | 2.38 | 1 | D | |
| 7 | 46,303 | 1250 | 2.70 | 2 | D F | |
| 8 | 33,247 | 1250 | 3.76 | 2 | D F | |
| 6 | 26,457 | 1250 | 4.72 | 2 | D F | |
| 17 | 23,090 | 1155 | 5.00 | 2 | D F | |
| 12 | 20,215 | 1011 | 5.00 | 2 | D F | |
| 10 | 17,114 | 856 | 5.00 | 2 | D F | |
| 15 | 15,561 | 778 | 5.00 | 1 | D | |
| 16 | 14,852 | 743 | 5.00 | 2 | D F | |
| 11 | 11,814 | 591 | 5.00 | 2 | D F | |

## APPENDIX B

The following listing of state ballot access requirements was compiled by plaintiffs from Karen M. Markin, *Ballot Access 3: For Presidential Candidates* (Nat'l Clearinghouse on Elec. Admin., Fed. Elec. Comm'n, Wash. D.C.) July 1995. The symbol "n/a" indicates that a presidential primary is not held.

| STATE | SIGNATURES REQUIRED |
|----|----|
| Alabama | 500 statewide or 50 per congressional district |
| Alaska | n/a |
| Arizona | 0 |
| Arkansas | 0 |
| California | 0 if candidate is generally recognized in the media |
| Colorado | 5000 statewide or $500 fee |
| Connecticut | 0 if candidate is generally recognized in media |
| Delaware | 500 statewide or 0 if candidate qualifies for matching funds |
| Dist. of Columbia | 1000 or 1% |
| Florida | 0 |
| Georgia | 0 |
| Hawaii | n/a |
| Idaho | 0 if candidate is generally recognized media |
| Illinois | 3000 statewide |
| Indiana | 5000 statewide, including 500 from each congressional district |
| Iowa | n/a |
| Kansas | 1000 statewide or $100 fee |
| Kentucky | 0 if candidate qualifies for matching funds or 5000 statewide |
| Louisiana | 1000 per congressional district or $750 filing fee |
| Maine | 0 |
| Maryland | 0 if candidate is generally recognized in the media |
| Massachusetts | 0 if candidate is generally recognized in the media |
| Michigan | 0 if candidate is generally recognized in the media |
| Minnesota | 2000 statewide or $500 fee |
| Mississippi | 0 if candidate is generally recognized in the media |
| Missouri | n/a |
| Montana | 2000 statewide |
| Nebraska | 0 if candidate is generally recognized in the media |
| Nevada | n/a |
| New Hampshire | 0 if candidate is generally recognized in the media |
| New Jersey | 1000 statewide |
| New Mexico | 0 if candidate is generally recognized in the media |
| New York | 5% or 1250 in each congressional district |
| North Carolina | 0 if candidate is generally recognized in the media |
| North Dakota | 300 statewide |
| Ohio | 0 if candidate is eligible to receive matching funds |
| Oklahoma | 1000 per congressional district or $2500 fee |

| STATE | SIGNATURES REQUIRED |
|---|---|
| Oregon | 0 if candidate is generally recognized in the media |
| Pennsylvania | 2000 statewide |
| Rhode Island | 1000 statewide |
| South Carolina | 0 |
| South Dakota | 0 |
| Tennessee | 0 if candidate is generally recognized in the media |
| Texas | 0 (unless required by party rule) |
| Utah | n/a |
| Vermont | 1000 statewide and $500 fee |
| Virginia | n/a |
| Washington | 0 if candidate is generally recognized in the media |
| West Virginia | 1% of presidential salary or 4 signatures for each dollar of fee |
| Wisconsin | 0 if candidate is generally recognized in the media |
| Wyoming | n/a |