Henry GREEN, Plaintiff,

v.

Sandra MORTHAM, Secretary of State,
State of Florida, in her official
capacity, Defendant.

No. 96–1143–CIV–T–23A.

United States District Court,
M.D. Florida,
Tampa Division.

Jan. 12, 1998.

Mark R. Brown, St. Petersburg, FL, Susan Helms Bingham, Largo, FL, for Plaintiff.

George L. Waas, Office of Atty. Gen., State of Fla., Dept. of Legal Affairs, Tallahassee, FL, for Defendant.

**ORDER**

PIZZO, United States Magistrate Judge.

This is a primary election ballot access case. Plaintiff alleges that the requirements that a would-be candidate must meet to appear on a Congressional primary election ballot in this state violate his right to associate freely with the political party of his choice and his right to equal protection under the law. After careful consideration, this court finds, however, that Florida's primary ballot access requirements pass constitutional muster.

**I. Factual Background and Procedural History**

Plaintiff brought this action pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the United States Constitution. This cause is now before the court on the parties' cross motions for summary judgment (docs. 51 and 52) and the respective responses thereto.[1] The Defendant has stipulated that the facts material to this action are those alleged in the First Amended Complaint (See Defendant's motion for summary judgment (doc. 12) and her renewed motion for summary judgment (doc. 51)). Accordingly, the court can dispose of this case as a matter of law pursuant to Fed.R.Civ.P. 56.

The Plaintiff in this action is Henry Green ("Green"). Green is a registered Democratic voter in Pinellas County, Florida who, through a stroke of good fortune, became the sole candidate for the U.S. House of Representatives in the 1996 Democratic primary for the Tenth Congressional District.[2] Under the Florida election laws in place at the time, Green could have qualified for inclusion on the 1996 Congressional primary ballot in two ways. First, he could have paid a statutorily set filing fee equal to a percentage of the annual salary for the office he sought. Fla.Stat. ch. 99.092(1) (1995).[3] Second, Green could have appeared on the Democratic primary ballot if he obtained the

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to my jurisdiction over this matter (doc. 36).

2. Green has also expressed a desire, by affidavit, to seek the same nomination in 1998.

3. In 1996, when Mr. Green first sought access to the primary ballot, the filing fee was set at 7.5% of Congressional salary, which translated to $10,-020.

signatures of 3% of the total number of the registered Democratic voters in the Tenth District. Fla.Stat. ch. 99.095(3) (1995). In 1996, this petitioning alternative would have required Green to obtain signatures from 4,077 registered Democrats in the Tenth District. Mr. Green did not meet either of these access requirements before their respective deadlines.[4]

On April 17, 1996, however, the district court for the Northern District of Florida coincidently invalidated the configuration of Florida's Third Congressional District in the case styled *Johnson v. Mortham*, 926 F.Supp. 1460 (N.D.Fla.1996). In so doing, the court cast doubt upon the validity of the boundaries of Florida's other Congressional districts. To alleviate any negative or unfair effects possibly caused by the court's decision in *Johnson*, the Florida legislature extended by approximately two months the deadlines for obtaining access to Congressional primaries statewide. The new deadline for qualifying through the submission of signatures was set for June 10, and a would-be primary candidate could qualify by paying the 7.5% fee on or before June 21, 1996. 1996 Fla. Laws ch. 96–192, § 8. Green only learned of this extension on June 4, through a memorandum circulated by the Defendant to local election supervisors.

Despite the extension of the filing deadlines, Green did not believe that he would be able to qualify for the primary. Consequently, he filed this action on June 12 challenging the constitutionality of Florida's primary ballot access requirements and seeking an injunction ordering that he be placed on the Tenth District Democratic primary ballot. On June 20, however, the day before the new deadline for qualifying by paying the qualifying fee ran, the Democratic Congressional Campaign Committee and the Florida Democratic Party each made unexpected $5,000 donations to Green. Green used these funds to pay the qualifying fee under protest. Green ran unopposed in the Democratic primary election but ultimately lost his bid for Congress to Rep. Bill Young, the 26–year

Republican incumbent, in the general election.

In conjunction with paying the filing fee, Green withdrew his motion for preliminary injunctive relief and a subsequently filed motion for a temporary restraining order but maintained his claims challenging the constitutionality of the relevant laws. During the pendency of this action, and after the parties had filed their initial cross motions for summary judgment, the state legislature amended section 99.092(1), Florida Statutes, reducing the qualifying fee from 7.5% to 6% of Congressional salary. 1997 Fla. Laws ch. 97–13, § 11. As a result, Plaintiff obtained leave to amend his complaint in order to attack both the constitutionality of the statute as it read and was applied to him in 1996 and as amended and applicable to the 1998 primary in which he plans to participate. After the Plaintiff amended his complaint, the parties renewed their motions for summary judgment.

## II. Discussion

### A. Mootness and Standing

The Plaintiff has standing to advance the claims asserted in the Amended Complaint. In her memorandum of law, the Defendant has not argued that Green's attack on Florida's 1996 primary ballot access laws was mooted by his participation in the relevant primary or by the amendment of section 99.092(1), Florida Statutes, nor has Defendant asserted that Plaintiff lacks standing to bring a pre-enforcement challenge to the ballot access laws currently in place and applicable to the 1998 primaries. Although, substantively speaking, ballot access jurisprudence is widely inconsistent, it is a well-settled principle that given the brief duration of the election season ballot access cases are capable of repetition yet susceptible to evading review. Therefore, the fact that the election at issue has come and gone does not moot a plaintiff's claims. *Norman v. Reed*, 502 U.S. 279, 287, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992); *Brown v. Chote*, 411 U.S. 452, 457 n. 4, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973).

---

**4.** In 1996 Green made no attempt to qualify for the primary by satisfying the petitioning alterna-

tive.

More specifically, the Supreme Court has held that a plaintiff who pays a filing fee and participates in an intervening election does not moot his legal challenge to the constitutionality of the paid fee where there is no indication that the defendant will cease collecting it in the future. *Morse v. Republican Party of Virginia*, 517 U.S. 186, 116 S.Ct. 1186, 1213 n. 48, 134 L.Ed.2d 347 (1996); *see also, American Civil Liberties Union v. The Florida Bar*, 999 F.2d 1486, 1496 (11th Cir. 1993) (holding that an intervening judicial election did not moot the plaintiff's First Amendment challenge to a Florida Bar disciplinary rule prohibiting judicial candidates from publicly criticizing their opponents). This is particularly true where, as here, the Plaintiff intends to participate in a subsequent election, thereby subjecting himself to the same process or requirements at a later date. *Chandler v. Miller*, 520 U.S. 305, —— n. 2, 117 S.Ct. 1295, 1300 n. 2, 137 L.Ed.2d 513 (1997).

Relatedly, the fact that the state legislature amended the Florida Statutes during the pendency of this action, reducing the filing fee at issue by 1.5%, does not moot the Plaintiff's claims. "The well settled rule [is] that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice...." *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 113 S.Ct. 2297, 2301, 124 L.Ed.2d 586 (1993); *see also, The Florida Bar*, 999 F.2d at 1495 (holding that a case or controversy remains after a defendant voluntarily ceases the allegedly improper conduct but remains free to resume it at any time). Finally, Green is not prohibited from challenging Florida's current primary ballot access requirements though not yet subject to them. Plaintiff has testified by affidavit that he intends to seek the Democratic nomination for the Tenth District's house seat in 1998, which will subject him to the current ballot access requirements. Green, therefore, has standing to challenge the law as currently written. *The Florida Bar*, 999 F.2d at 1493; *Minnesota Citizens Concerned for Life v. Federal Election Commission*, 113 F.3d 129,

131 (8th Cir.1997); *Vannatta v. Keisling*, 899 F.Supp. 488, 493 (D.Or.1995).

### B. Florida's Primary Election and Primary Ballot Access Schemes

As background, it should be noted that Florida uses a closed primary election system to nominate candidates for Congress. That is, a Florida elector can only vote the official primary ballot of the political party designated in that elector's voter registration. Fla.Stat. ch. 101.021 (1995). First primary elections are held on the Tuesday nine weeks prior to a November general election. The candidate who receives a majority of the votes in a party's Congressional primary election becomes that party's candidate in the general election. Fla.Stat.Ann. § 100.061 (West 1997). If no primary candidate receives a majority of the votes, a runoff is held. *Id.*

In this case, Green is attacking the constitutionality of the provisions of Florida's election code which control how a person can become a candidate in a primary election. As outlined above, there are two alternative ways in which a person, otherwise qualified to run for office, may be included on a primary election ballot. One way is by paying a statutorily set qualifying fee. Currently, section 99.092, Florida Statutes provides, in pertinent part, that:

Each person seeking to qualify for nomination or election to any office, except a person seeking to qualify pursuant to s. 99.095 and except a person seeking to qualify as a write-in candidate, shall pay a qualifying fee, which shall consist of a filing fee and election assessment, to the officer with whom the person qualifies, and any party assessment levied.... The amount of the filing fee is 3 percent of the annual salary of the office. The amount of the election assessment is 1 percent of the annual salary of the office sought. The election assessment shall be deposited into the Elections Commission Trust Fund. The amount of the party assessment is 2 percent of the annual salary....

1997 Fla. Laws ch. 97–13, § 11. As applied to a person seeking access to the Congressional primary ballot in the upcoming 1998

primaries, section 99.092 requires the payment of a $8,016 qualifying fee.[5]

The second way to obtain access to a primary ballot is by gathering the signatures of three percent of the voters who are registered in the area of representation as members of the party whose nomination the would-be candidate seeks. In this regard, section 99.095 currently provides, in pertinent part, as follows:

(1) A person seeking to qualify for nomination to any office may qualify to have his or her name placed on the ballot for the first primary election by means of the petitioning process prescribed in this section. A person qualifying by this alternative method shall not be required to pay the qualifying fee or party assessment required by this chapter. A person using this petitioning process shall file an oath with the officer before whom the candidate would qualify for the office stating that he or she intends to qualify by this alternative method for the office sought.... The oath shall be filed at any time after the first Tuesday after the first Monday in January of the year in which the first primary is held, but prior to the 21st day preceding the first day of qualifying period for the office sought.... No signatures shall be obtained by a candidate on any nominating petition until the candidate has filed the oath required in this section....

(3) When the candidate has field the oath prescribed in subsection (1), the candidate may begin to seek signatures on petitions supporting his or her candidacy. Only signatures of electors who are registered in the political party by which the candidate seeks to be nominated and who are registered to vote in the ... district ... represented by the office sought shall be counted toward obtaining the minimum numbers of signatures.... A candidate for any ... district office to be elected on less than a statewide basis shall obtain the signature of a number of qualified electors of the district ... equal to at least 3 percent of the total number of registered voters of

the party by which the candidate seeks nomination that are registered within the district ... as shown by the Department of State for the last preceding general election.

By its express terms, section 99.095 provides an alternative qualifying method to section 99.092, in that it allows a potential candidate to qualify for a primary ballot without paying any portion of the fee. As applicable to the upcoming Congressional Democratic primary in the Tenth District, a person seeking access to the ballot under this section will need to collect approximately 4,700 signatures.[6]

### C. Threshold Considerations

In his Amended Complaint, Green asserts that the provisions of the Florida Statutes set forth above violate his First Amendment right to associate freely with the political party of his choice. Green also claims that sections 99.092 and .095, Florida Statutes infringe upon his Fourteenth Amendment right to equal protection because they impermissibly grant preferential treatment to "affluent" candidates. Plaintiff has asserted these constitutional claims in an eight count amended complaint organized along the following lines: a) four First Amendment claims, one directed to each of the two provisions at issue as they applied to Plaintiff in 1996 and as they currently exist (Counts II, IV, VI, and VIII) and b) four Fourteenth Amendment claims, one directed to each of the two provisions at issue as they applied to him 1996 and as they currently exist (Counts I, III, V, and VII). Consistent with the organization of his amended complaint, in his motion for summary judgment, Plaintiff addresses the constitutionality of sections 99.092 and 99.095 separately, thus implicitly encouraging the court to do the same. More than a mere logistical detail, the perspective this court adopts when reviewing the statutory provisions at issue—either operating separately or in tandem—is a critical threshold issue to this particular case.

---

5. The 7.5% qualifying fee applicable to the 1996 Congressional primary required payment of a $10,040 qualifying fee.

6. State of Florida Dept. of State, Division of Elections, *1998 Candidate Petition Requirements*, at 24.

**1456**

■ The Plaintiff's discrete approach is inconsistent with the logic and the teachings of the Supreme Court's ballot access opinions which direct lower courts to consider ballot access schemes in their entirety when passing on their constitutionality. A reviewing court must determine whether "the totality of the restrictive laws taken as a whole imposes a burden on voting and associational rights." *Williams v. Rhodes,* 393 U.S. 23, 34, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *see also, Storer v. Brown,* 415 U.S. 724, 737, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (stating that "a number of facially valid election laws may operate *in tandem* to produce impermissible barriers to constitutional rights" (emphasis added)); *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (in which the Court upheld the specific ballot access requirements at issue after satisfying itself that other portions of Georgia's election laws ensured reasonably open access to the ballot); *Burdick v. Takushi,* 504 U.S. 428, 438, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (holding that "Hawaii's prohibition on write-in voting, considered as part of an electoral scheme that provides constitutionally sufficient ballot access, does not impose an unconstitutional burden upon the First and Fourteenth Amendment rights of the State's voters"); *Libertarian Party of Florida v. State of Florida,* 710 F.2d 790 (11th Cir.1983) (considering the relevant ballot access requirements together in determining whether a 3% signature requirement for minor parties to be placed on the general presidential election ballot was constitutional).

Perhaps most significant to this case, a global approach is inherently mandated by the Supreme Court's qualifying fee decisions. In *Lubin v. Panish,* the Court held that "in the absence of a reasonable *alternative means* of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay." 415 U.S. 709, 718, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (emphasis added); *see also, Bullock v. Carter,* 405 U.S. 134, 149, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (holding same); *Little v. Florida Dept. of State,* 19 F.3d 4, 5 (11th Cir.1994) (holding that a filing fee as part of a ballot qualification scheme does not run afoul of the Constitution where an alternative qualifying method is also available). In directing courts to consider whether there is a reasonable alternative means of access to the qualifying fee, the Supreme Court requires reviewing courts to analyze ballot access schemes macroscopically. Certainly, *Lubin* and *Bullock* do not mean that an alternative to paying a qualifying fee can only be "reasonable" if it is included in the same section, subsection, or sentence of the statute as the qualifying fee requirement. Rather, Plaintiff correctly frames the issues when, in his memorandum, he asks: can an onerous filing fee requirement be saved by a petition/signature alternative? [7]

### D. Plaintiff's First Amendment Claims

■ In this case, Green argues that sections 99.092 and .095 infringe upon his right to associate with the Democratic party by unduly hindering his ability to become a primary candidate. Although it is a right protected by the First Amendment, the right to associate with a political party by becoming its candidate for public office is not considered "fundamental." *Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982), *citing, Bullock,* 405 U.S. at 143.[8]

7. Plaintiff later states in his memorandum that *Lubin* and *Bullock* "left unanswered whether a reasonable petition/signature alternative might cure the unconstitutional obstacle presented by grossly excessive filing fees." Quite to the contrary, *Lubin* and *Bullock* both suggest that a reasonable alternative to paying the filing fee may render an otherwise unconstitutional ballot access law constitutional. In *Lubin* the Supreme Court even offered a reasonable petition/signature alternative as just such a saving grace. 415 U.S. at 719.

8. It is well established that the type of infringement which Green complains about has an effect on voters as well as the potential candidate. "[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock,* 405 U.S. at 143. Ballot access restrictions tend to limit the field of candidates from which voters might choose, which dampens their associational rights as well as their right to effectively cast their vote. *Id.; Anderson v. Celebrezze,* 460 U.S. 780, 786–787, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). The Plaintiff has, however, made no effort to vindicate any right of Tenth District Democratic voters. In fact, at the hear-

On the other side of the coin from a would-be candidate's associational rights is the state's interest in keeping elections fair, honest, and orderly. "As the Court has expressly noted, a state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Dixon v. Maryland State Admin. Bd. of Elections*, 878 F.2d 776, 779 (4th Cir.1989).

■ With these countervailing rights and interests in mind, the Supreme Court developed a balancing test to apply in determining whether a ballot access law violates the First Amendment rights of candidates.

> [The court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justification for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

■ Accordingly, this court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment that the plaintiff seeks to vindicate." *Id.* The court agrees with the Plaintiff that sections 99.092 and .095, Florida Statutes impose obstacles to obtaining a spot on a primary election ballot. Conditioning primary ballot access upon either paying a qualifying fee or obtaining the requisite number of signatures has at

least some detrimental effect on Green's right to associate with the party of his choice through seeking its nomination for Congress. Under Florida law, Green cannot become a Congressional primary candidate simply by declaring himself to be one.

On the other hand, the court finds that the magnitude of this injury is moderate at worst. Again, the operation of sections 99.092 and .095 do not completely prohibit Green from exercising his right to associate with the Democratic party by becoming a candidate in its primary. Unlike the early filing deadline at issue in *Anderson*, which absolutely prohibited a candidate from seeking an independent party's nomination for President after a date far in advance of the general election, the instant ballot access requirements only make the exercise of Green's associational rights more difficult by imposing alternative conditions to inclusion on the primary ballot—in this case either paying $8,016 ($10,020 in 1996) or obtaining the signatures of approximately 4,700 eligible petitioners (4,077 in 1996).

Although $8,000 is not an insignificant amount of money for most people, Plaintiff can become a primary candidate without paying a dime if he satisfies the petitioning requirement. By operation of Florida's election code, in 1998, Plaintiff will have approximately 3 months or some 96 days to obtain the requisite signatures.[9] Since the Plaintiff will need about 4,700 signatures to access the Tenth District Democratic primary ballot in 1998, a mere five volunteers collecting only 10 signatures a day for Plaintiff would satisfy this requirement. Acting alone, the Plaintiff will only need to collect 52 signatures a day. Given the relatively limited geographic area in which eligible petitioners live in this case, and the ease with which they may be identified and targeted through the use of voter registration rolls, the petitioning requirement hardly seems unreasonable.[10]

---

ing of the parties' cross motions for summary judgment, Plaintiff's counsel specifically stated that none of Green's claims were based on an alleged injury to the rights of voters. Thus, in deciding the motions before it, the court will not consider the impact of sections 99.092 and .095 on Tenth District Democratic voters.

**9.** State of Florida Dept. of State, Division of Elections, *1998 Election Dates to Remember*, at 3.

**10.** Numerous courts, including the Supreme Court, have found more onerous signature requirements constitutional. *See, e.g., Storer*, 415 U.S. at 740 (suggesting that collecting 325,000 signatures in 24 days (13,542 signatures/day) in order for an independent presidential candidate

As the Plaintiff's own evidence indicates, numerous individuals have complied with Florida' ballot access requirements over the years and fully exercised their right to associate with a major party by running in its Congressional primary. This is true even when Florida's primary qualifying fee was at its 7.5% zenith between 1991 and 1996 and the petitioning requirement was the same as it is now (3%). In 1992, 43 Democrats and 44 Republicans qualified to participate in Congressional primaries statewide. In 1994, 19 Democrats and 39 Republicans became primary candidates for Congress in Florida. In 1996, Congressional primary candidates numbered 29 Democrats and 30 Republicans. Significantly, the total number of Congressional primary candidates from each party in 1992, the first election year in which the qualifying fee was 7.5%, was the highest of all the years for which the parties submitted evidence in this case.

Moreover, the total number of primary candidates during the years in which the qualifying fee was 7.5% do not significantly differ from the totals for past years when the qualifying fee was lower. For instance, from 1978 to 1988, when the qualifying fee was 5%, the average number of Democratic Congressional primary candidates was approximately 25 per year statewide and the average number of Republican candidates was roughly 23 candidates annually. In 1990, with a 6% qualifying fee in effect, 19 Democrats and 26 Republicans obtained access to their respective Congressional primary ballots. Although this statistical evidence admittedly fails to account for those who may have wanted to run in a Congressional primary over the years but failed to obtain access to the ballot, it does indicate that, despite increases in the qualifying fee and growing voter populations in Florida, it has been, and remains, possible for a significant number of diligent people to successfully exercise their right to associate with the political party of their choice by participating in its primary. Of course, what this particular statistical evidence most poignantly suggests is that overall it was no harder to obtain access to a Congressional primary ballot in 1996 that it was in 1978, 1986, 1990, or any other election year for the past 20 when the qualifying fee ranged from 5 to 7.5%.[11]

Further, the fact that no candidate obtained access to the primary ballot using the signature alternative until 1992, when the filing fee was increased from 6 to 7.5%, is irrelevant at best for the Plaintiff and may in fact militate against him. Again, the court believes that Florida's ballot access alternatives should be viewed in tandem when determining their constitutionality. As noted above, the consideration is whether "the totality of the restrictive laws taken as a whole imposes a burden on voting and associational rights." *Williams*, 393 U.S. at 34. Thus, how frequently one ballot access alternative is used relative to the other simply does not matter so long as the law in its entirety does not overly burden a would-be candidate's associational rights. That having been said,

---

to access a general election ballot is not constitutionally infirm); *LaRouche v. Kezer*, 990 F.2d 36, 41 (2d Cir.1993) (holding that a requirement of collecting 466 signatures a day in order to access a presidential primary ballot is constitutional); *Andress v. Reed*, 880 F.2d 239, 242 (9th Cir.1989) (holding 10,000 signatures in 45 days to access ballot for statewide office is constitutional); *U.S. Taxpayers of Florida v. Smith*, 871 F.Supp. 426, 433–34 (N.D.Fla.1993), *aff'd*, 51 F.3d 241(11th Cir.1995) (noting that a requirement of collecting 30 signatures per day to be placed on a general election ballot as a candidate for president is not unreasonable). Although the cited opinions do not necessarily address ballot access requirements for congressional primaries, the signature requirements considered by the reviewing courts are so much more burdensome than the one before me that any difference between the scope and nature of the election is irrelevant.

11. This is exactly the point made by the Eleventh Circuit in *Libertarian Party of Florida*. As the *Libertarian Party* court explained, all ballot access requirements, whether they be dollar figures or signatures, are arbitrarily drawn. Under Plaintiff's argument and evidence, a 5% fee would be just as unconstitutional as the 7.5% figure since roughly the same number of candidates attained access to Florida's Congressional primaries when the fees varied between these percentages of Congressional salary. Under the circumstances, courts must exercise caution not to play piecemeal legislator, whittling a state's filing fee down to nothing through a series of rulings. *Libertarian Party of Florida*, 710 F.2d at 793.

the fact that an increasing number of candidates obtained access to Congressional primary ballots between 1992 and 1996 using the petitioning alternative only goes to show that it is a realistic option to paying a larger filing fee, in that a potential candidate may choose to use it and ultimately satisfy its conditions. Accordingly, the injury inflicted on Green by Florida's ballot access requirements, including an optional filing fee as high at 7.5%, seems no more than moderate.

Under the *Anderson* balancing test, the court is to now "identify and evaluate the precise interest put forward by the state as justification for the burden imposed by its rules." *Anderson*, 460 U.S. at 789. In passing judgment, however, a reviewing court must also consider the strength and legitimacy of the state's interests and the extent to which those interests make it necessary to burden the plaintiff's rights. *Id.*

In this case, the state has claimed two interests supporting its primary ballot access requirements: 1) to assure ballot integrity (the seriousness of the candidates) and 2) to defray election costs. (See Defendant's response to Plaintiff's Interrogatory No. 23). The Supreme Court has approved both of these goals as state interests worthy of advancement. *Bullock*, 405 U.S. at 145–48; *Lubin*, 415 U.S. at 712–13; *Jenness*, 403 U.S. at 442; *see also*, *Dixon*, 878 F.2d at 783. Courts appear to consider the former of these two interests as particularly strong, even at the primary election stage. As the Supreme Court explained in *Lubin*

> [t]he role of the primary election process . . . is underscored by its importance as a component of the total electoral process and its special function to assure that fragmentation of voter choice is minimized. That function is served, not frustrated, by a procedure that tends to regulate the filing of frivolous candidates. A procedure inviting or permitting every citizen to present himself to the voters on the ballot

without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process. . . . That 'laundry list' ballots discourage voter participation and confuse and frustrate those who do participate is too obvious to call for extended discussion.

415 U.S. at 715.

As for defraying the costs associated with a primary election, the Supreme Court has taken a more skeptical view of this interest than it has of assuring candidate legitimacy and consequently has taken a more active hand in limiting states' efforts to fund elections through collecting filling fees. For instance, in *Bullock*, the Supreme Court cautioned states from attempting to saddle candidates and their financial contributors with the entire cost of holding a primary election. 405 U.S. at 147–48 & n. 29. Nevertheless, *Bullock's* caveat is of limited application in this case because Florida's ballot access scheme serves state interests beyond simply paying for the primary and assuring that only serious candidates appear on the primary ballot.[12]

As the preamble to section 99.092, Florida Statutes states, the law is also intended to strengthen the integrity of the election process by promoting campaign finance reform and through establishing the public funding of political campaigns. 1991 Fla. Laws ch. 91–107. This claimed legislative purpose is further evidence by the operation of Florida's election code. The current 6% qualifying fee is, in fact, the aggregate of three separate fees—a 3% filing fee, a 2% election assessment, and a 1% party assessment. 1997 Fla. Laws ch. 97–13 § 11. Although the disbursement of these various fees is rather convoluted, the bottom line is that a large portion of the total money collected as quali-

---

**12.** The law at issue in *Bullock* required primary candidates to pay a mandatory qualifying fee to the county executive committee of the political party conducting the election, who was also responsible for determining the amount of the fee. In setting the amount of the fee, the law required the committee to make an estimate of the total cost of the subject primary and to apportion that cost among the various candidates by collecting a filing fee. In short, the Texas law at issue in *Bullock* required the payment of a mandatory filing fee which was obviously intended to fund the entire cost of conducting a primary election.

**1460**

fying fees appears to find its way back to the party whose nomination the candidate seeks, *Id.* at § 14, while another portion goes to covering the expenses of the Florida Elections Commission, a quasi-judicial board who investigates and hears administrative complaints filed with the Division of Elections. *Id.* at § 11 and Fla.Stat.Ann. § 106.24 (West 1997). Although, at the hearing of their motions, neither party could say exactly what percentage of the total qualifying fee is actually used to defray primary election costs, it appears from a reading of the Florida Statutes to be only a relatively small fraction.

Thus, the Plaintiff's claim that Florida's qualifying fee is only as high as it is because it is unconstitutionally designed to cover all of the direct costs associated with conducting primary elections is simply wrong, while the state's explanation that the qualifying fee constitutionally "defrays" primary election expenses is dramatically oversimplified. All things considered, sections 99.092 and .095 appear to advance the state's interest in funding the state administration and regulation of elections, actually leveling the playing field between "affluent" and "non-affluent" candidates by providing for the public funding of political campaigns within the limitations imposed by the First Amendment, and assuring candidate seriousness. The Plaintiff has not even suggested that the bulk of these particular state interests are constitutionally questionable, and the court agrees with the Defendant and the Florida legislature that they are, in fact, compelling.[13]

Ultimately, sections 99.092 and .095, acting in tandem, do not significantly dampen Green's right to associate with the party of his choice by seeking its nomination for Congress. The minor burdens imposed on Green are necessary and well justified by the strong interests advanced by the state in enacting sections 99.092 and .095. Accordingly, sections 99.092 and 99.095, Florida Statutes, both as they read and were applied to Green in 1996 and as currently written and applicable to the 1998 Congressional primaries, are not violative of the First Amendment.

### E. Plaintiff's Equal Protection Claims

Plaintiff also claims that sections 99.092 and .095, Florida Statutes violate his equal protection rights because they discriminate between "affluent" and "non-affluent" candidates. Plaintiff's equal protection claims are plagued by profound problems. First, the Plaintiff completely ignores the hard threshold question of whether it makes a difference for purposes of consideration under the Constitution that the class of disadvantaged "non-affluent" candidates cannot be defined in customary equal protection terms; that is, they are not specifically identifiable as is the class in the Libertarian Party cases such as *Anderson.* See *San Antonio School District v. Rodriguez,* 411 U.S. 1, 19, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (discussing the problems posed by claimed discrimination against an amorphous "economically disadvantaged" class). Second, as noted above, the right to associate with a political party by becoming its candidate for public office is not fundamental. *Clements,* 457 U.S. at 963, *citing, Bullock,* 405 U.S. at 143.[14] Finally, Florida's petitioning alternative provides an option to paying the qualifying fee that is no way related to wealth.

These problems are fatal to Green's equal protection claim. With respect to the existence of a non-monetary alternative to a paying a fee to exercise a constitutional right,

---

**13.** At the hearing of the parties' motions, Plaintiff's counsel stated that he was not challenging the constitutionality of Florida's efforts to publicly finance political campaigns. Rather, the Plaintiff simply complains of the "extraction" of the qualifying fee and the resulting burden that it imposes. Nevertheless, the public financing of political campaigns is one of the state interests advanced by the laws he is attacking. Consequently, the Plaintiff cannot, under any legal analysis, avoid considering the propriety of public campaign financing altogether.

**14.** Although the Supreme Court recently characterized this right as "basic" in *M.L.B. v. S.L.J.,* 519 U.S. 102, ——, 117 S.Ct. 555, 568, 136 L.Ed.2d 473 (1996), "basic" is not synonymous with "fundamental" which is a term of art in equal protection jurisprudence. Further, *M.L.B.* is not a ballot access or voting case, and the Court's characterization of the right to candidacy as basic in that opinion seems, insignificantly, overstated.

the Supreme Court explained in its *San Antonio School District* opinion that

> "individuals, or groups of individuals, who constituted the class discriminated against in our prior cases shared two distinguishing characteristics: because of their impecunity they were completely unable to pay for some desired benefit, and as a consequence, they sustained an *absolute deprivation* of a meaningful opportunity to enjoy that benefit." 411 U.S. at 20 (emphasis added).

As the Court further explained, the bulk of its wealth-based equal · protection jurisprudence up to that time hinged upon whether the state had provided some "adequate substitute" or "reasonable alternative" to paying a substantial sum of money in order to exercise a particular right. *Id.* at 21–22. Where no less expensive or non-monetary alternative was available, the challenged fee or charge was generally declared unconstitutional because it absolutely deprived those who could not pay it of a constitutional right. Most significantly, this general rule lies at the heart of the Court's decisions in *Lubin*, *Bullock*, and the Eleventh Circuit's decision in *Little*.

In this case, Green argues that the petitioning alternative is unreasonable in part because, like the qualifying fee, it costs too much to satisfy. In other words, Green contends that only the "affluent" can comply with the signature alternative. In support of this argument, Plaintiff submitted the affidavit of Richard Arnold, CEO of a for-profit corporation called Voter Outreach, Inc. ("Voter Outreach"). Voter Outreach is in the business of obtaining signatures from voters across the country in order to satisfy the petitioning requirements for public referenda and political campaigns. In his affidavit, Arnold testifies that Voter Outreach's "normal

charge" for soliciting signatures for political campaigns is between $.85 and $2.00 per signature. Based on this testimony, Plaintiff argues that comfortably complying with section 99.095's signature alternative may cost over $9,000, which is more than Florida's current 6% qualifying. fee and much more than most other states' fees.

This argument is entirely founded, however, on the assumption that the only way to successfully satisfy the signature requirement is to hire Voter Outreach or a similar *for-profit* company. Plaintiff presumes that volunteerism and grassroots politics is totally dead. The court is not that cynical. As explained above, the signature alternative could be met by rallying only a small force of volunteers to collect just a handful of signatures daily throughout the petitioning period. Although such an effort may impose some insignificant opportunity costs on those collecting signatures, including the would-be candidate, and may entail some direct expenses, for example whatever fee the local election authority may charge for a list of registered voters and certain transportation expenses, accessing a primary ballot by petition does not require paying a for-profit company thousands of dollars to collect signatures as Plaintiff suggests.

Also unpersuasive is Plaintiff's argument that section 99.095 is an unreasonable alternative to paying the qualifying fee because the number of signatures required is greater than that required by other states. It should go without saying that this court is in no way bound by the legislative pronouncements of other states, nor is this court free to impose the legislative choices of Georgia, Maryland, or New York on Florida lawmakers. *Libertarian Party of Florida*, 710 F.2d at 793–94.[15] For these reasons, the court concludes

---

15. In encouraging the court to look to other state's ballot access requirements, Plaintiff has cited to *Rockefeller v. Powers*, 917 F.Supp. 155, 160 (E.D.N.Y.1996), which states that "[t]he first indication a 5% ... figure is unduly harsh is provided by the evidence of other states' practices." *Rockefeller* is, however, a presidential primary case, which distinguishes it from the instant case with respect to the importance of other states' ballot access requirements. As the district court explained in *Rockefeller*, "a presidential primary requires a kind of campaign that

is very different from an ordinary campaign for local office. In a national · presidential campaign, ballot access restrictions that require enormous outlays of money and manpower will lead candidates to concentrate their resources in other states where the return on their investment, measured in terms of potential delegates and national exposure, will be greater per dollar spent. Thus, to prevent candidates from competing in a certain state, the state legislature need not adopt access restrictions that are, in the

that the signature alternative is reasonable and, consequently, that Florida's primary ballot access requirements do not violate Green's Fourteenth Amendment right to equal protection, nor did they cause such a constitutional violation with respect to the 1996 primary election.

### F. Summary

Ballot access cases do indeed require courts to make difficult judgments. Judicial analyses vary greatly depending not only on the type of ballot access provision at issue but also based on the right allegedly violated as well as the type of election at issue. Ultimately, a district court must be mindful of "whether the challenged laws 'freeze' the status quo." *Jenness,* 403 U.S. at 439. In passing judgment on the challenged laws, it is essential to view them in a realistic light. *Bullock,* 405 U.S. at 143; *American Party of Texas v. White,* 415 U.S. 767, 783, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). In the final analysis, the question in these cases generally becomes whether a state's ballot access requirements impose unreasonable conditions upon becoming a candidate. *Libertarian Party of Florida,* 710 F.2d at 793, *citing, Anderson,* 460 U.S. at 790. As explained above, Florida's ballot access requirements are not unreasonable. In their application, the provisions at issue appear to allow a politically healthy number of candidates to access Congressional primary election ballots.

### III. Conclusion

For the foregoing reasons it is hereby

**ORDERED** that:

1. The Plaintiff's Renewed Motion for Summary Judgment (doc. 52) is **DENIED;**

2. The Defendant's Renewed Motion for Summary Judgment (doc. 51) is **GRANTED;** and

3. The clerk of the court is directed to enter a separate final judgment consistent with

this order and to close the file on this matter.

abstract, insurmountable. Instead, it need only adopt restrictions that are substantially more burdensome than those adopted by other states."

*Id.* Therefore, in such cases, what other states do may be of some significance, but not here.