

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-11-2003

# Belitskus v. Pizzingrilli

Precedential or Non-Precedential: Precedential

Docket No. 01-3747

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Belitskus v. Pizzingrilli" (2003). *2003 Decisions.* Paper 235.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/235

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 11, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos: 01-3747 and 01-3824

_____

WILLIAM M. BELITSKUS; THOMAS ALAN LINZEY;
BARBARA KNOX; JOHN STITH; ERIC PRINDLE;
JENNARO PULLANO; RALPH NADER;
NADER 2000 PRIMARY COMMITTEE;
PENNSYLVANIA GREEN PARTY; WILL DONOVAN, III

v.

KIM PIZZINGRILLI, in her official capacity
as Secretary of State of Pennsylvania;
RICHARD FILLING, in his official capacity
as the Commissioner overseeing Pennsylvania's
Bureau of Commissions, Elections and Legislation,

Appellants in Docket No. 01-3747

Thomas Alan Linzey, John Stith*
Pennsylvania Green Party and Will Donovan III,

Appellants in Docket No. 01-3824

* Dismissed Per Clerk's 11/29/01 Order.

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 00-cv-01300)
District Judge: Honorable A. Richard Caputo

_____

Argued on September 10, 2002

Before: NYGAARD, ROTH and WEIS, *Circuit Judges*

(Opinion filed September 11, 2003)

D. Michael Fisher
Attorney General
John G. Knorr, III (Argued)
Chief Deputy Attorney General
Chief, Appellate Litigation Section
Gregory R. Neuhauser
Senior Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

   *Counsel for Appellants/Cross
   Appellees*

Bonita P. Tenneriello, Esquire
 (Argued)
John C. Bonifaz
Brenda Wright
Lisa J. Danetz
National Voting Rights Institute
One Bromfield Street, Third Floor
Boston, Massachusetts 02108

Jordan B. Yeager, Esquire
Boockvar & Yeager
2 West Butler Avenue
P.O. Box 1884
Doylestown, PA 18901

David Kairys, Esquire
1719 N. Broad Street
Philadelphia, PA 19122

   *Counsel for Appellees/Cross
   Appellants*

---

**OPINION OF THE COURT**

---

ROTH, Circuit Judge:

   The Pennsylvania election code requires candidates for various local, state, and national offices to pay a filing fee prior to having their names placed on the ballot. During the 2000 campaign, plaintiffs challenged the filing fee,

contending that the mandatory nature of the fee, coupled with the absence of an alternative means by which indigent candidates might gain access to the ballot, violated the Equal Protection Clause of the Fourteenth Amendment. The District Court found the mandatory filing fee unconstitutional as applied to John Stith, a candidate for the state legislature who demonstrated his inability to pay the fee without financial hardship. The District Court therefore permanently enjoined the Commonwealth[1] from applying the challenged fee structure to Stith or to other similarly situated candidates.

The Commonwealth appealed on the grounds that Stith had ample resources to pay the fee, that the fee was constitutional as applied to Stith, and that, even if the fee was unconstitutional, the District Court's order was unduly broad and vague. The remaining plaintiffs, Thomas Linzey, a candidate for state attorney general, William Donovan, a registered voter supporting Linzey's candidacy, and the Pennsylvania Green Party, of which Stith, Linzey, and Donovan were members, have cross-appealed the District Court's granting of summary judgment against them.

## I. Background

### A. *The Commonwealth's Ballot Access Laws*

The Pennsylvania ballot access law requires candidates for various public offices to pay a filing fee in order to have their names placed on the general election ballot. Specifically, the law provides: "Each person filing any nomination petition shall pay for each petition, at the time of filing, a filing fee . . . *and no nomination petition shall be accepted or filed, unless and until such filing fee is paid* . . . ." 25 Pa. Stat. Ann. § 2873(b.1) (emphasis added). The fees range from $5 to $200, depending on the office sought. The law applies equally to all candidates regardless of

---

1. For ease of reference, the two defendants, Kim Pizzingrilli, Secretary of State, and Richard Filling, Commissioner of the Bureau of Commissions, Elections, and Legislation, both of whom were sued in their official capacity, will be collectively referred to throughout this Opinion as "the Commonwealth."

political affiliation. However, it contains no waiver provisions or other means for an indigent candidate to gain access to the ballot. The Commonwealth concedes that it has received "several inquiries" regarding fee waivers but that it keeps no official record of such inquiries and is unable to state the exact number received.

Candidate filing fees for statewide elections are paid when the candidates' nomination petitions are filed with the Secretary of the Commonwealth. 25 Pa. Stat. Ann. §§ 2873(a) & 2873(b.1). The total collected varies by year, averaging approximately $70,000 to $80,000 in even years, and $22,000 to $23,000 in odd years. These funds are used to provide a variety of election-related services, including (1) review of nomination petitions and papers to ensure compliance with applicable requirements, (2) review of documents pertaining to candidate withdrawals and substitutions, (3) creation and distribution of election information for candidates, and (4) consideration of and responses to candidate inquiries. The total cost of such services is estimated to be approximately $46,000 in even years, and $23,000 in odd years. The revenue generated by the filing fees is not, however, expressly earmarked for the funding of these services. It is instead placed into the Commonwealth's general operating fund. *See* 25 Pa. Stat. Ann. § 2873(b.1).

In addition to paying the required filing fees, candidates must also comply with the statutory signature requirements. Specifically, candidates for statewide office must collect signatures equal to two percent of the largest vote total for any statewide candidate in the last election. 25 Pa. Stat. Ann. § 2911(b). Those seeking other offices must obtain signatures equal to two percent of the largest vote total received by any candidate in their district during the last election. *Id.* However, these signature requirements are in no way correlated with, or affected by, the applicable filing fee. Thus, although the number of signatures needed to obtain ballot access will naturally vary from one district to another, candidates for positions in the state legislature all pay the same filing fee regardless of the size of their district or the number of signatures required.

### B. *Factual Background*

Plaintiff John Stith sought to have his name placed on the November 2000 ballot as the Green Party candidate for State Representative in the 77th District. As such, he was required to pay a $100 filing fee. To support his allegation that he would suffer financial hardship if compelled to pay the fee, Stith has submitted evidence that he had an adjusted gross income of approximately $35,000 in 1999 and $11,000 in 2000. As of July 2000, his take-home pay was approximately $1,200 per month, compared to his monthly living expenses of $1,073.[2] At the time the fee was due, Stith's assets included $50 in campaign funds and a personal bank account balance of $1,500. Among his liabilities were $40,000 in student loans and $3,500 in credit card debt. Stith made a loan of $1,000 of his own money to his campaign. The loan was repaid with campaign funds following the election.[3]

Plaintiff Thomas Linzey, the Green Party's candidate for Attorney General, was required to pay a filing fee of $200 in order to gain access to the ballot. Like Stith, Linzey alleged that he too "would suffer financial hardship" if forced to pay the applicable fee. Linzey's adjusted gross income for the year 2000 was $4,611. He incurred average monthly living expenses of $380 ($150 for rent, $120 for food, $70 for utilities, $20 in credit card payments, $10 for clothing, and $10 for fuel and maintenance for his housemate's car). Linzey received a $200 check from a campaign supporter but was unable to cash it because the check was made out to the "Linzey for Attorney General Committee," an entity which did not exist.

Plaintiff William Donovan was a student at Pennsylvania State University at the time the complaint was filed. He was registered to vote in the Commonwealth during the

---

2. There is some debate between the parties as to the proper method for calculating Stith's monthly income and expenses. Because we would reach the same result regardless of which set of figures is used, we will, for the sake of argument, accept those proffered by the Commonwealth.

3. Although Stith had collected only $50 in campaign contributions at the time the filing fee was due, he had raised a total of approximately $4,800 by the time of the election.

November 2000 election and was a supporter of various Green Party candidates, including Linzey. His gross income for the year 2000 was $5,821.68. Donovan no longer lives in Pennsylvania, and there is no evidence in the record to suggest he plans to return at any time in the future.

Plaintiff Pennsylvania Green Party, of which Stith, Linzey, and Donovan are members, is a political body as defined by Pennsylvania law. *See* 25 Pa. Stat. Ann. § 2831. It alleges that many of its candidates "would suffer financial hardship" as a result of the continued application of the challenged fee structure. The Party asserts that its members, many of whom "are drawn from the less affluent segment of the Pennsylvania community," support their chosen candidates "regardless of their ability to pay the filing fees." *Id.*

Defendant Kim Pizzingrilli is Secretary of State of the Commonwealth. As such, she is responsible for overseeing various aspects of the Commonwealth's election process, including receipt of candidates' nomination petitions and filing fees. Defendant Richard Filling serves as Commissioner for the Bureau of Commissions, Elections and Legislation and has administrative responsibility for various aspects of the election process, including ballot access. Both defendants were sued in their official capacity.

## II.  Procedural History

Plaintiffs filed their complaint on July 24, 2000. Pursuant to 42 U.S.C. § 1983, they seek, *inter alia*, declaratory and injunctive relief on behalf of a number of individuals and political organizations.[4] Specifically, they allege that the statutes establishing the Commonwealth's ballot access scheme violate the Equal Protection Clause of the Fourteenth Amendment.

On July 25, 2000, the District Court denied plaintiffs' request for a temporary restraining order but then, on July

4. Of these, only Stith, Linzey, Donovan, and the Pennsylvania Green Party are before us on appeal. The remaining plaintiffs were dismissed by joint stipulation, *see* Fed. R. Civ. P. 41, prior to the filing of the cross-motions for summary judgment.

28, the court granted a preliminary injunction as to Stith and "any otherwise qualified candidate who is unable to pay the cost of the fee." This injunction required the Commonwealth to provide Stith and other similarly situated candidates with "an alternative measure or measures for gaining access to the ballot prior to or at the time of the August 1, 2000 deadline."

As a result of the preliminary injunction, the Commonwealth offered to exempt Stith and Linzey from payment of their respective fees upon their execution of an affidavit declaring that they could not comply with the law without suffering financial hardship. Stith and Linzey both signed affidavits and were placed on the November 2000 ballot without having to pay the required fees.[5]

The District Court entered a permanent injunction on August 20, 2001, enjoining the Commonwealth from applying the statutory fee to "Plaintiff Stith or other candidates who cannot afford to pay the filing fee." *Belitskus v. Pizzingrilli*, No. 3:CV-00 1300, 2001 WL 34064600, at *4 (M.D. Pa. Aug. 20, 2001). The permanent injunction further prohibited the Commonwealth from "requiring candidates to pay a filing fee they cannot afford in order to appear on the ballot." *Id.* Because the District Court concluded that Linzey and Donovan failed to demonstrate entitlement to relief, summary judgment was granted to the Commonwealth with respect to their claims.[6] *Id.* at *2 n.2.

On August 28, 2001, plaintiffs moved to amend the injunction to include Linzey. The District Court denied this motion, stating that the broad scope of the order permitted

5. Copies of these affidavits were not included in the record. However, neither party disputes this issue, and we therefore accept Plaintiffs' representations as to the affidavits' existence and content.

6. This portion of the District Court's ruling has caused some confusion. The court mistakenly classified Donovan as a candidate, rather than a voter, and therefore granted summary judgment to the Commonwealth based at least in part on the fact that the court believed Donovan had failed to sufficiently establish his inability to pay the required fee. In addition, the order fails to dispose of the claim asserted by the Pennsylvania Green Party. We address both of these issues below.

Linzey to attempt at a later time to demonstrate his inability to pay the required fee, thereby making such an amendment unnecessary. This appeal and cross-appeal followed.

### III. Jurisdiction and Standards of Review

Plaintiffs filed suit pursuant to 42 U.S.C. § 1983. The District Court therefore exercised subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331. We have jurisdiction to review a district court's issuance or refusal to modify an injunction pursuant to 28 U.S.C. § 1292(a).

We exercise plenary review over all jurisdictional questions, including whether a plaintiff has standing to assert a particular claim, *see General Instrument Corp. of Del. v. Nu-Tek Elec. & Mfg., Inc.*, 197 F.3d 83, 86 (3d Cir. 1999), and whether a plaintiff's claim is moot. *See Salovaara v. Jackson Nat'l Life Ins. Co.*, 246 F.3d 289, 295 (3d Cir. 2001). Our review of the District Court's summary judgment determinations is also plenary, and we utilize the same test applied below. *Saldana v. Kmart Corp.*, 260 F.3d 228, 231 (3d Cir. 2001). Thus, "[s]ummary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Chisolm v. McManimon*, 275 F.3d 315, 321 (3d Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). Summary judgment is not appropriate, however, "if a disputed fact exists which might affect the outcome of the suit under the controlling substantive law." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993).

### IV. Discussion

#### A. *Standing*

Because "'[t]he existence of a case or controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief,'" *Philadelphia Fed'n of Teachers v. Ridge*, 150 F.3d 319, 322-23 (3d Cir. 1998)

(quoting *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994)), we first must consider the Commonwealth's contention that plaintiffs lack standing to challenge the mandatory filing fee. The fact that the Commonwealth asserts this argument for the first time on appeal is immaterial, as "[s]tanding represents a jurisdictional requirement which remains open to review at all stages of the litigation." *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994); *see also Public Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 n.5 (3d Cir. 1997) ("Like any jurisdictional requirement, standing cannot be waived.").

In order to establish a case or controversy, a plaintiff must demonstrate the following three elements:

> First, the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*AT&T Communications of N.J., Inc. v. Verizon N.J., Inc.*, 270 F.3d 162, 170 (3d Cir. 2001) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "These requirements ensure that plaintiffs have a 'personal stake' or 'interest' in the outcome of the proceedings, 'sufficient to warrant . . . [their] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on . . . [their] behalf.'" *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 175 (3d Cir. 2001) (quoting *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 537-38 (3d Cir. 1994)).

In addressing this issue, the Commonwealth argues that neither Stith nor Linzey suffered a cognizable injury because both possessed sufficient funds to pay the applicable filing fees at the time they were due. Because the

claims asserted by Donovan and the Pennsylvania Green Party are derivative of those brought by Stith and Linzey, the Commonwealth concludes that they too are without standing to challenge its fee structure.

We disagree. Turning first to Stith, we note that he possessed only $50 in campaign funds at the time the fee was due. Although he had a personal savings account containing approximately $1,500, his liabilities included roughly $43,500 in unpaid student loans and credit card debt. In addition, Stith's monthly income only marginally exceeded his monthly expenses, and he was unable to afford basic expenses such as health insurance, dental care, and prescription eyeglasses. Paying the required fee would have completely depleted his campaign funds and required him to delve into his limited personal assets. Accordingly, we conclude that Stith has successfully demonstrated sufficient injury to satisfy the requirements of Article III. *See Joint Stock Soc'y*, 266 F.3d at 177 ("All that the Article III's injury-in-fact element requires is 'an identifiable trifle' of harm") (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 (1973)).

In so concluding, we reject the Commonwealth's argument that a candidate challenging a mandatory filing fee must establish that payment of the fee would result in the complete depletion of personal or campaign funds in order to demonstrate injury to a protected interest. *See, e.g.*, *Green v. Mortham*, 155 F.3d 1332 (11th Cir. 1998) (standing not questioned where candidate used campaign contributions to pay filing fee under protest during pendency of ballot access challenge); *Harper v. Vance*, 342 F. Supp. 136, 140 (N.D. Ala. 1972) (three judge panel) (candidate considered "unable" to pay mandatory filing fee where doing so would leave him "nearly destitute").[7] Rather,

---

7. As noted by the court in *Harper*, the rejection of this argument is consistent with the approach taken by the Supreme Court regarding indigent plaintiffs seeking permission to proceed *in forma pauperis*:

We cannot agree with the court below that one must be absolutely destitute to enjoy the benefit of the statute. *** To say that no

we conclude that a significant impact of such a fee on an indigent candidate's ability to meet personal living expenses and on the candidate's campaign strategy and allocation of resources is sufficient to satisfy the requirements of Article III. Indeed, similar harms have often been held to confer standing in the political context. *See, e.g.*, *Becker v. Federal Election Comm'n*, 230 F.3d 381, 386-87 (1st Cir. 2000) (candidate's claim that challenged practice of allowing corporate sponsorship of presidential debates affected use of his campaign funds and overall strategy held to establish standing); *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 37 (1st Cir. 1993) (candidate's forced choice regarding the acceptance of public campaign financing affected campaign strategy and therefore "constitute[d] an injury of a kind sufficient to confer standing"); *Fulani v. Krivanek*, 973 F.2d 1539, 1544 (11th Cir. 1992) (standing not questioned where candidate asserted that paying signature verification fee "would impose an undue burden by diverting funds from her party's attempt to identify, reach, and communicate with potential supporters").

Because Stith's injury is clearly traceable to the actions of the Commonwealth and was redressed by a favorable

---

persons are entitled to the statute's benefits until they have sworn to contribute to payment of costs, the last dollar they have or can get, and thus make themselves and their dependents wholly destitute, would be to construe the statute in a way that would throw its beneficiaries into the category of public charges. \*\*\* [T]he result [is not] desirable if the effect of this statutory interpretation is to force a litigant to abandon what may be a meritorious claim in order to spare himself complete destitution.

*Harper*, 342 F. Supp. at 140 (quoting *Adkins v. E.I. DuPont De Nemours & Co.*, 335 U.S. 331, 339-40 (1948)). *See also Jones v. Zimmerman*, 752 F.2d 76, 78-79 (3d Cir. 1985) (holding that district court abused its discretion in denying *in forma pauperis* status to prisoner facing a $5.00 filing fee when the prisoner earned $15.00 per month and had a prison savings account containing $17.39); *Bullock v. Suomela*, 710 F.2d 102, 103 (3d Cir. 1983) (district court abused its discretion in denying *in forma pauperis* status and requiring prisoner to pay partial filing fee of $4.00 out of net assets of $4.76); *Souder v. McGuire*, 561 F.2d 820, 823-24 (3d Cir. 1975) (district court erred in denying *in forma pauperis* status to prisoner with total assets of $50.07).

decision below, we conclude that Stith has also satisfied the remaining elements of the case or controversy requirement. *See AT&T Communications*, 270 F.3d at 170. We conclude therefore that he has demonstrated that he has standing to challenge the mandatory filing fee.

For the reasons stated above, we also hold that Linzey, whose financial resources were even more limited than Stith's, has standing. Indeed, given the fact that Linzey's living expenses totaled $4,560 ($380 per month for twelve months) in 2000, paying the required $200 filing fee would have caused his expenses to exceed his adjusted gross income of $4,611. Moreover, the fact that Linzey received a single $200 campaign donation that would have exactly covered the cost of his fee does not alter our analysis. Our conclusion is consistent with the Supreme Court's rejection of forced reliance upon campaign contributions to satisfy mandatory filing fees. *See Bullock v. Carter*, 405 U.S. 134, 144 (1972).

Finally, because the alleged injuries suffered by Donovan and the Green Party are derivative of those of Stith and Linzey, *see id.* at 143; *Henderson v. Fort Worth Independent School District*, 526 F.2d 286, 288 n.1 (5th Cir. 1976) (citing *Bullock* for the proposition that a voter wishing to support a candidate barred from the ballot "clearly has standing" to challenge the ballot access law at issue), we hold that they too have satisfied the applicable standing requirements.

### B.   The Supreme Court's Ballot Access Jurisprudence

Turning then to the merits of plaintiffs' challenge to the Pennsylvania mandatory filing fee, Article I, Section 4, Clause 1 of the Constitution grants to the individual states not only the power to regulate congressional elections but also the inherent power "to regulate their own elections" as well. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Indeed, " 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.' " *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Nevertheless, a state's power to regulate elections "must be exercised in a manner consistent with the Equal Protection Clause of the Fourteenth Amendment." *Bullock*, 405 U.S. at 141.

In order to exercise this inherent power, even though " 'the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system,' " *Lubin v. Panish*, 415 U.S. 709 (1974) (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)), the states may limit access to the ballot. For example, they may enact laws limiting the number of names appearing on a ballot "in order to concentrate the attention of the electorate on the selection of a much smaller number of officials." *Id.* at 712 (citation and internal quotation omitted). These restrictions afford voters " 'the opportunity of exercising more discrimination in their use of the franchise.' " *Id.* Accordingly, mandatory filing fees are widely used as a means of both limiting ballot access and recouping some of the costs incurred in the administration of public elections. *Id.* at 713.

Nevertheless, the Supreme Court has twice held filing fees to be unconstitutional if, as here, the state has failed to provide an alternative means of ballot access for indigent candidates unable to make the required payment. First, in *Bullock*, the Court invalidated a Texas statute that established a mandatory filing fee but failed to provide any other means of ballot access. Although the challenged fee in *Bullock* was both "far from exceptional" in size, 405 U.S. at 138 and limited to party primaries, *id.* at 140, the Court concluded that its exclusionary effect was "neither incidental nor remote." *Id.* at 144. Rather, the Court held that the statutory scheme at issue tended "to deny some voters the opportunity to vote for a candidate of their choosing," while simultaneously giving affluent voters "the power to place on the ballot their own names or the names of persons they favor." *Id.* The Court therefore concluded that the challenged fee structure fell "with unequal weight on voters, as well as candidates, according to their economic status." *Id.*

The Supreme Court next addressed the mandatory filing fee issue in *Lubin*. There, it again recognized the state's legitimate interest in limiting ballot access:

> A procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational

voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process. That no device can be conjured to eliminate every frivolous candidacy does not undermine the state's effort to eliminate as many such as possible . . . . Rational results within the framework of our system are not likely to be reached if the ballot for a single office must list a dozen or more aspirants who are relatively unknown or have no prospects of success.

415 U.S. at 715-16.

The Court nevertheless held that this interest "must be achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity." *Id.* at 716. Accordingly, because fee statutes can "operate to exclude some potentially serious candidates from the ballot without providing them with any alternative means of coming before the voters," the Court held that, "in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay." *Id.* at 718. It is against this backdrop that we consider the challenge before us.

### C. Anderson *Balancing*

Our first step in analyzing equal protection claims is to determine the appropriate level of scrutiny. *Reform Party of Allegheny Co. v. Allegheny Co. Dep't of Elections*, 174 F.3d 305, 314 (3d Cir. 1999) (*en banc*). Making this determination requires an analysis of the challenged fee's effect on plaintiffs' rights. *Id.*

In examining this issue we note that, as a practical matter, it is self-evident that state statutes regulating ballot access " 'inevitably affect — at least to some degree — the individual's right to vote and his right to associate with others for political ends.' " *Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 70 (3d Cir. 1999) (*Alternative Political Parties II*) (quoting *Anderson*, 460 U.S. at 788). Nevertheless, "not all such restrictions are

unconstitutional." *Id.* Rather, "[w]here the statute imposes only a minimal nondiscriminatory burden on minor parties, yet affords 'reasonable access' to the ballot, it generally has been upheld." *Id.* (citing *Burdick*, 504 U.S. at 438). Indeed, subjecting "every voting regulation to strict scrutiny and . . . requir[ing] that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. "Accordingly, the mere fact that a State's system 'creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny.'" *Id.* at 433-34 (quoting *Bullock*, 405 U.S. at 143).

In light of these competing interests, the Supreme Court has developed the following balancing test for use in determining the appropriate level of scrutiny to be applied in ballot access cases:

> [A reviewing court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789. Pursuant to this test, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. "[W]hen those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). However, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions'

upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* at 434 (quoting *Anderson,* 460 U.S. at 788).[8]

Our first step in applying *Anderson* requires a consideration of the burdens imposed on plaintiffs' constitutional rights. *See Anderson,* 460 U.S. at 789. Here, plaintiffs contend that the rights of indigent candidates and their supporters are severely burdened by the filing fees at issue and that the challenged ballot access scheme therefore is subject to strict scrutiny under *Anderson* and its progeny. In reply, the Commonwealth urges that Stith

---

8. We note that *Anderson* was not expressly decided on equal protections grounds, *see Anderson,* 460 U.S. at 786, and that some uncertainty therefore exists regarding its applicability to equal protection-based challenges of state ballot access laws such as the one at bar. *See, e.g., Fulani,* 973 F.3d at 1543 ("It is not entirely clear . . . whether the Supreme Court would apply [the *Anderson* test] in an equal protection situation. None of the Supreme Court cases employing the *Anderson* test concerned an equal protection challenge to state election laws."); Recent Cases, 113 Harv. L. Rev. 1045, 1047 n.27 (2000) ("In the years since the *Anderson* test was formulated, the Supreme Court has not evaluated any ballot access restrictions under the Equal Protection Clause. As a result, legitimate disagreement exists about whether the *Anderson* balancing test applies in that context."). However, neither party challenges its application to the instant equal protection claim, nor do we see any basis for refusing to so apply it. *See Reform Party,* 174 F.3d at 314 (assuming that certain burdens "require the same level of scrutiny in an equal protection analysis that they do in an associational rights analysis"); *Republican Party of Arkansas v. Faulkner Co.,* 49 F.3d 1289, 1293 n.2 (8th Cir. 1995) ("In election cases, equal protection challenges essentially constitute a branch of the associational rights tree. When the Supreme Court finds a violation of Equal Protection, it is nevertheless First and Fourteenth Amendment associational rights which are inequitably burdened."); *Fulani,* 973 F.2d at 1543 (finding *Anderson* applicable to equal protection-based challenges to ballot access laws).

Additionally, we note that, although *Anderson* involved a national election, we have previously held that it is equally applicable in the context of state elections. *See Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 882 (3d Cir. 1997) (*Alternative Political Parties I*). We therefore conclude that its application to the case before us is appropriate.

and Linzey had sufficient resources from which to pay the applicable filing fee. It therefore contends the burdens they faced were minimal, and that strict scrutiny is thus inappropriate.

For the reasons cited above in our discussion of Article III standing, we reject the argument that Stith and Linzey were required to pay the mandatory fees simply because they had access to minimally sufficient funds to do so. Although we do not pass on the precise showing necessary to establish the type of financial hardship contemplated by the Supreme Court in *Bullock* and *Lubin*, we conclude that difficulty in raising the funds to pay the required fee, looked at in light of the total assets and liabilities of the candidate, is sufficient to satisfy the test. The fact that, in order to pay the fee, Stith and Linzey would have had to completely deplete their campaign funds and to expend funds needed to pay ongoing living expenses and prior legitimate debts is sufficient to demonstrate financial hardship.

Moreover, if a ballot access scheme, such as the one here, imposes a mandatory filing fee but fails to provide an alternative means of ballot access, such as signature collection, that scheme constitutes a severe burden on the rights of indigent candidates and their supporters. This conclusion is clearly supported by the Supreme Court's decision in *Bullock*. There, the Court conceded that the "disparity in voting power" caused by election systems that separate candidates on the basis of wealth "cannot be described by reference to discrete and precisely defined segments of the community as is typical of inequities challenged under the Equal Protection Clause." 405 U.S. at 144. It further noted that "there are doubtless some instances of candidates representing the views of voters of modest means who are able to pay the required fee." *Id.* Nevertheless, the Court concluded that such systems clearly "fall[ ] with unequal weight on voters, as well as candidates, according to their economic status." *Id.*

The *Bullock* Court therefore looked to poll tax cases such as *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966), which utilized traditional equal protection strict scrutiny analysis, as providing the appropriate level of scrutiny for analysis of ballot access laws such as those at issue here.

*See Bullock*, 405 U.S. at 142-44; *see also Anderson*, 460 U.S. at 792-93 & n.15 (citing *Bullock* for the proposition that "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status"); *Dart v. Brown*, 717 F.2d 1491, 1501 (5th Cir. 1983) (noting that the application of strict scrutiny in *Bullock* and *Lubin*); *Adams v. Askew*, 511 F.2d 700, 703 (5th Cir. 1975) ("[W]here the fees exacted have 'a real and appreciable impact on the exercise of the franchise,' based solely upon lack of wealth and inability to translate voter support into dollars, a strict standard of review is to be applied.") (quoting *Bullock*, 405 U.S. at 144).

The Commonwealth points to the size of its filing fees as a reason to avoid strict scrutiny. This argument is not sufficient. A relatively minimal fee, which is nevertheless mandatory, means only that a smaller class of potential candidates will be barred from the ballot. *See Lubin*, 415 U.S. at 717 (even moderate fees may prevent "impecunious but serious candidates . . . from running"). In the absence of a reasonable alternative means of ballot access, any mandatory fee, no matter how small, will inevitably remain "exclusionary as to some aspirants." *Id.* at 718. We therefore conclude that the Commonwealth's failure to provide a reasonable alternative means of ballot access severely burdened plaintiffs' rights.

The second, and final, step under *Anderson* requires us to "identify and evaluate the precise interests put forward by the [Commonwealth] as justifications for the burden imposed by its rule." 460 U.S. at 789. In so doing, we "must not only determine the legitimacy and strength" of the interests asserted by the Commonwealth, but "also must consider the extent to which those interests make it necessary to burden [Stith and Linzey's] rights." *Id.* Because we have found the burden to be severe in this case, the Commonwealth's regulations "must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotations omitted).

In conducting this analysis, "we cannot speculate about possible justifications" for the challenged statute, but instead " 'must identify and evaluate the precise interests put forward by the [Commonwealth] as justifications for the burden imposed by its rule.' " *Reform Party*, 174 F.3d at 315 (quoting *Anderson*, 460 U.S. at 789). Moreover, our review is limited to those justifications cited by the Commonwealth before the District Court, as " '[i]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument.' " *Id.* at 316 (quoting *Brenner v. Local 514, United Bhd. of Carpenters*, 927 F.2d 1283, 1298 (3d Cir. 1991).

Here, the Commonwealth identified two justifications for the imposition of the disputed fees: (1) the regulation and/or limitation of the number of candidates permitted on the ballot, and (2) the use of filing fees to defray election costs. We consider each in turn.

First, with respect to the Commonwealth's assertion that a mandatory filing fee properly limits ballot access to serious candidates, we note, as the District Court did, *see Belitskus*, 2001 WL 34064600 at *4, that the *Bullock* Court found such fees to be "extraordinarily ill-fitted to that goal" due to the availability of other means for protecting such interests. *Bullock*, 405 U.S. at 146. Indeed, courts in subsequent cases have repeatedly held that mandatory fees do not, in and of themselves, properly separate out spurious candidates. *See, e.g.*, *Clements v. Fashing*, 457 U.S. 957, 964 (1982) ("Economic status is not a measure of a prospective candidate's qualifications to hold elective office, and a filing fee alone is an inadequate test of whether a candidacy is serious or spurious."); *Lubin*, 415 U.S. at 717 ("Filing fees, however large, do not, in and of themselves, test the genuineness of a candidacy or the extent of the voter support of an aspirant for public office. A large filing fee may serve the legitimate function of keeping ballots manageable but, standing alone, it is not a certain test of whether the candidacy is serious or spurious."); *Fulani*, 973 F.2d at 1547 (states "cannot use [a signature verification fee] to decide who deserves to be on the ballot," as "a party's ability to pay a verification fee is not rationally related to whether that party has a modicum

of support"); *Dixon v. Maryland State Admin. Bd. of Election Laws*, 878 F.2d 776, 784 (4th Cir. 1989) (noting that mandatory fees "bar neither a wealthy frivolous candidate, who can afford the fee, nor a destitute one, who is entitled to a waiver").

We see no basis for reaching a different conclusion where, as here, the Commonwealth's election laws also contain signature requirements, *see* 25 Pa. Stat. Ann. § 2911, that more appropriately measure a candidate's level of commitment and popular support than does a mandatory filing fee. In contrast to the fee, these signature requirements fall equally on all candidates regardless of economic status. *See Green v. Mortham*, 989 F. Supp. 1451, 1461 (M.D. Fla.), *aff'd*, 155 F.3d 1332 (11th Cir. 1998). Accordingly, even though the Commonwealth's interest in limiting the number of candidates on the ballot may be considered to be one "of compelling importance," *Burdick*, 504 U.S. at 434, its attempt to achieve this goal by imposing a mandatory filing fee in addition to the existing signature requirement while, at the same time, failing to provide an alternative means of ballot access, can in no way be said to be "narrowly drawn." *See Lubin*, 415 U.S. at 718 ("Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests."). We therefore reject this interest as a potential justification for the challenged ballot access scheme.

The Commonwealth's second asserted justification — that it has a legitimate interest in defraying the costs of elections — has been rejected by the Supreme Court in its determination that a candidate need not pay his share of the costs of an election that his participation incurs. *See Bullock*, 405 U.S. at 148; *see also Dixon*, 878 F.2d at 783 (citing *Bullock* for the proposition that costs which are simply "concomitants of the State's legislative choice to hold an election" may not be imposed on candidates). Such a claim is particularly unavailing here where the fees collected exceed the costs incurred by the Commonwealth for the election related services described earlier and are deposited directly into the Commonwealth's general

operating fund. Thus, we conclude that this interest is not "of compelling importance," nor is the means of achieving it "narrowly drawn." *Burdick*, 504 U.S. at 434. We therefore also reject it as a basis for upholding the constitutionality of the Commonwealth's mandatory filing fee as applied to Stith and Linzey.

In making this "as applied analysis," we do not disapprove of the importance of the interests cited by the Commonwealth. Our rejection of these interests as justifications for the mandatory filing fee is premised not on their legitimacy, but rather on the fact that they do not resolve the core issue before us. Simply put, this case is not about the size of the challenged filing fees, which, as the Commonwealth correctly notes, are relatively moderate. Nor is it about the interests pursued by the Commonwealth in assessing these fees. Indeed, both interests cited by the Commonwealth are legitimate; they have been recognized as such by the Supreme Court, *see Lubin*, 415 U.S. at 713, and have repeatedly been held to justify similar filing fees when the challenged ballot access scheme includes a reasonable alternative means of ballot access. *See, e.g.*, *Lindstedt v. Missouri Libertarian Party*, 160 F.3d 1197, 1199 (8th Cir. 1999); *Green*, 155 F.3d at 1338; *Matthews v. Little*, 498 F.2d 1068, 1069 (5th Cir. 1974).

Rather, the primary issue in this case is the absence of a reasonable alternative means of ballot access. *See Fulani*, 973 F.2d at 1546; *Little v. Florida Dep't of State*, 19 F.3d 4, 5 (11th Cir. 1994) ("It is undisputed that a filing fee as part of the qualifications for seeking elected office does not run afoul of the constitution where . . . an alternative method is also available."). By failing to provide such an alternative, the Commonwealth has made economic status a decisive factor in determining ballot access. It therefore has run afoul of the Supreme Court's ballot access jurisprudence. *See Anderson*, 460 U.S. at 805 ("For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty. . . . If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.") (citations and internal quotations omitted).

Because we conclude that the Pennsylvania mandatory filing fee, as applied to Stith and Linzey, clearly violates the Equal Protection Clause, we will affirm the District Court's grant of summary judgment as to Stith's claim, and we will reverse and remand the District Court's ruling as to Linzey with instructions that summary judgment be entered on his behalf.

### D. Claims Asserted by Donovan and the Pennsylvania Green Party

As noted above, the District Court entered summary judgment in favor of the Commonwealth with respect to the claim asserted by Donovan. However, the August 20th Order has caused some confusion, as it appears the District Court mistakenly classified Donovan as a candidate rather than a voter and also failed to dispose of the claim brought by the Green Party.[9]

In their cross-appeal, Donovan and the Green Party now contend that the ruling below was equivalent to a finding that the Commonwealth's ballot access scheme is unconstitutional on its face. Each then argues in the alternative that they are entitled to summary judgment even in the absence of a finding of facial unconstitutionality.

First, we reject the assertion that the District Court intended to strike the challenged ballot access scheme as unconstitutional on its face. Simply put, there is no question that this case was filed and litigated as an "as applied" challenge.[10]

9. In ruling on his claim, the District Court held that Donovan "did not present evidence establishing that [he] could not afford to pay the filing fee," and therefore granted summary judgment to the Commonwealth as to his claim. *Belitskus*, 2001 WL 34064600, at *2 n.2. The order makes no mention of the Pennsylvania Green Party.

10. Indeed, plaintiffs' claims clearly would have failed if brought as a facial challenge. In order to successfully prosecute such a challenge, plaintiffs would have to establish that no set of circumstances exist under which mandatory filing fees are valid. *See Artway v. Attorney Gen. of the State of N.J.*, 81 F.3d 1235, 1252 n.13 (3d Cir. 1996) ("To make a successful facial challenge in a non-First Amendment context, a

Nor do we need to reach the merits of Donovan's "as applied" claim because we conclude that his claim is not "capable of repetition, yet evading review," and is therefore moot. In order for Donovan's claim to be excepted from mootness, Donovan must establish that "(1) the challenged action was in its duration too short to be fully litigated to its cessation or expiration and (2) there is a reasonable likelihood that [he will] be subjected to the same action again." *Doe v. Delie*, 257 F.3d 309, 313 (3d Cir. 2001).

We have no difficulty in concluding that the claims asserted by Stith, Linzey, and the Pennsylvania Green Party meet the above-cited requirements, and that they therefore are not moot despite the fact that the 2000 election has long since passed. *See Belitskus*, 2001 WL 34064600 at *4 n.7; *Green*, 989 F. Supp. at 1453 ("[I]t is a well-settled principle that given the brief duration of the election season ballot access cases are capable of repetition yet susceptible to evading review. Therefore, the fact that the election at issue has come and gone does not moot a plaintiff's claims.").[11] Indeed, the Commonwealth makes no argument

litigant 'must establish that no set of circumstances exists under which the Act would be valid.' ") (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Such a ruling would clearly run afoul of the Supreme Court's general approval of such fees. *See Lubin*, 415 U.S. at 712-13; *Bullock*, 405 U.S. at 147; *see also West Virginia Libertarian Party v. Manchin*, 270 S.E.2d 634, 639 (W. Va. 1980) (noting that *Bullock* and *Lubin* "cannot be read to abrogate all filing fee requirements. Their teaching is that as to those candidates who cannot pay the filing fee, some alternative mode of gaining access to the ballot must be provided such as petitions containing voter signatures."). Accordingly, a suit such as the one at bar must, by definition, be brought as an "as applied" challenge and decided on its facts.

11. Despite our limitation of the scope of the District Court's injunction, discussed *infra*, we have no trouble in concluding that Stith and Linzey's "as applied" challenge was too short in duration to be fully litigated prior to its expiration and that it therefore satisfies the first prong of the exception to mootness: capable of repetition, yet evading review.

Thus, the only question before us is the second prong of mootness — whether there is a "demonstrated probability" that the same parties will again be involved in the same dispute. *See Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988) (citation omitted).

to the contrary. We also note that derivative voter claims similar to the one asserted by Donovan have qualified for this exception in the past. *See Corrigan v. City of Newaygo*, 55 F.3d 1211, 1213-14 (6th Cir. 1995) (holding that voters' claim that their rights were violated by virtue of the fact that their candidates of choice were barred from the ballot was capable of repetition, yet evading review).

However, because Donovan has left the Commonwealth, and there is no evidence in the record to suggest he will return in the future, we simply cannot find that there is a reasonable likelihood he will again be eligible to vote for

---

The question whether Stith and Linzey will run in a future election, and, if so, whether they will again qualify as indigent, is a close one. However, as other courts have, we conclude that it is reasonable to expect political candidates to seek office again in the future. *See Vote Choice*, 4 F.3d at 37 n.12 (concluding that the case was not moot where plaintiff "ha[d] not renounced possible future candidacies, and politicians, as a rule, are not easily discouraged in the pursuit of high elective office"). Given the lack of evidence to the contrary, we further conclude that it is reasonable to assume that Stith and Linzey will again seek a waiver of the mandatory filing fees based on indigency. Thus, "[t]here is 'every reason to expect the same parties to generate a similar, future controversy subject to identical time constraints . . . .'" *Patriot Party of Allegheny County v. Allegheny County Dep't of Elections*, 95 F.3d 253, 257 (3d Cir. 1996) (quoting *Norman*, 502 U.S. at 287-88). Moreover, a finding that this case is moot would essentially doom all challenges to the Commonwealth's ballot access law, as it is unlikely that any indigent candidate's claim could complete its course during a given election. *See Arkansas AFL-CIO v. Federal Communications Comm'n*, 11 F.3d 1430, 1436 (8th Cir. 1993) (concluding that forcing plaintiffs to re-litigate their claim would lead to a reoccurrence of the same issues which prevented it from being litigated to conclusion prior to the previous election).

Our conclusion that the instant "as applied" challenge is capable of repetition, yet evading review, comports with the Supreme Court's treatment of similar cases. *See Storer*, 415 U.S. at 737 n.8 (holding that "as applied" challenge to a state election law was capable of repetition, yet evading review despite the fact that the election was "long over, and no effective relief c[ould] be provided to the candidates or voters"); *see also Anderson*, 460 U.S. at 784 n.3 (concluding that challenge to state's early filing deadline for independent candidates was not moot despite the fact that the election at issue had passed).

indigent candidates barred from the ballot by the challenged fee structure. *See Lyons*, 461 U.S. at 108-09 (plaintiff's claim that he will again be stopped by police and subjected to unreasonable force too speculative to support finding that challenged behavior was capable of repetition, yet evading review); *Doe*, 257 F.3d at 314 (finding no reasonable likelihood that a prisoner who is no longer incarcerated will again be subjected to the allegedly objectionable practices of prison officials). We therefore lack jurisdiction to address the merits of his claim, and will remand it to the District Court with instructions that it be dismissed as moot. *See Klein v. Califano*, 586 F.2d 250, 255 (3d Cir. 1978).

Finally, we address the claim that the District Court erred in failing to grant summary judgment to the Pennsylvania Green Party.[12] Because the claim of the Green Party is derivative of those asserted by Stith and Linzey and because both candidates adequately proved their claim, we conclude that the Green Party also has established entitlement to relief. We therefore will remand the claim asserted by the Green Party with instructions that summary judgment be entered on its behalf.

### E.  Scope of the Injunction

Rule 65(d) of the Federal Rules of Civil Procedure states, in pertinent part, as follows:

> Every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . .

Fed. R. Civ. P. 65(d). As we have previously held, district courts granting injunctions pursuant to this rule should craft remedies "no broader than necessary to provide full relief to the aggrieved plaintiff." *McLendon v. Continental Can Co.*, 908 F.2d 1171, 1182 (3d Cir. 1990).

---

12. Because this appeal is brought pursuant to 28 U.S.C. § 1292(a), finality of judgment is not required and our jurisdiction to consider these appeals is unaffected by the District Court's failure to rule on the Pennsylvania Green Party's motion for summary judgment.

The injunction at issue here permanently enjoins the Commonwealth from applying the challenged statute "to Plaintiff Stith or other candidates who cannot afford to pay the filing fee," and from "otherwise requiring candidates to pay a filing fee they cannot afford in order to appear on the ballot." *Belitskus*, 2001 WL 34064600, at *4. The Commonwealth contends that this order is overly broad and unduly vague because it prevents the application of the challenged fee structure to candidates unable to pay the required amount, but provides no criteria for making such determinations.

Having reviewed the text of the injunction in light of the facts of this case and the conclusions reached above, we conclude that the District Court erred in issuing an injunction broader than necessary to resolve the harm demonstrated by plaintiffs. *See McLendon*, 908 F.2d at 1182. Specifically, we hold that the District Court need only have enjoined the Commonwealth from enforcing the mandatory filing fees against Stith and Linzey during the November 2000 election and in any future election where they demonstrate that they will be subjected to similar financial hardship by the requirement that they pay the mandatory filing fee.

We also hold that it was not necessary for the District Court to include language in the injunction preventing the Commonwealth from enforcing the challenged statute against "candidates who cannot afford to pay the filing fee" or "otherwise requiring candidates to pay a filing fee they cannot afford in order to appear on the ballot." *Belitskus*, 2001 WL 34064600 at *4. This language does nothing more than order the Commonwealth to obey the law as stated in *Bullock* and *Lubin*. It therefore will be struck from the order. *See Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 83 (3d Cir. 1990) ("Overbroad language in an injunction that essentially orders a party to obey the law in the future may be struck from the order"); *SEC v. Warren*, 583 F.2d 115, 121 (3d Cir. 1978) (affirming district court's decision to dissolve injunction that "merely require[d] defendants 'to obey the law' in the future . . . a requirement with which they must comply regardless of the injunction").

In closing, we note that the vagueness and uncertainty of which the Commonwealth complains in challenging the scope of the District Court's injunction, as well as the need for such injunctions in the first instance, could be cured by simply amending the election code to comply with the Supreme Court's ballot access jurisprudence.

Many state election codes similar to the one at issue here (*i.e.*, ones that impose mandatory fees but lack alternative means of ballot access) were successfully challenged and/or amended following the Supreme Court's decisions in *Bullock* and *Lubin. See, e.g., Andress v. Reed*, 880 F.2d 239, 241 (9th Cir. 1989) (noting that California amended its election code following *Lubin*); *Robinson v. Pottinger*, 512 F.2d 775, 780 (5th Cir. 1975) (Alabama election law held to violate the Equal Protection Clause under *Lubin*); *Brown v. North Carolina State Bd. of Elections*, 394 F. Supp. 359, 362 (W.D.N.C. 1975) (three judge panel) (North Carolina ballot access scheme held unconstitutional pursuant to *Bullock* and *Lubin*); *West Virginia Libertarian Party*, 270 S.E.2d at 639 (West Virginia filing fees held to violate Equal Protection Clause as applied to indigent candidates under *Bullock* and *Lubin*); *see also* Br. For Appellees/Cross-Appellants at nn.16-19 (listing more than two dozen state statutes providing various alternative means of ballot access). Thus, the Commonwealth's current mandatory filing fee places it among the few states that have failed to come into compliance with applicable Supreme Court precedent.

The problems at the core of this case are better resolved by the Commonwealth's legislature than by the federal courts. The current lack of a reasonable alternative means of ballot access results in an election structure that is fundamentally flawed and will inevitably fail to pass constitutional muster as applied to a certain percentage of candidates. Continued case-by-case litigation of the Commonwealth's attempts to collect filing fees from indigent candidates will not serve the interests of the candidates, the Commonwealth, or its voters. The only way in which to conclusively resolve the problems that gave rise to this litigation is for the legislature to amend the statutes at issue to comply with the Supreme Court's ballot access jurisprudence.

## V.  Conclusion

For the reasons stated above, we will affirm the judgment of the District Court as to Stith, but we will vacate the injunction and remand it to the District Court to reissue it, limiting its scope in accordance with this Opinion. We will also reverse the District Court's judgments as to Linzey and the Pennsylvania Green Party and remand these claims to the District Court with instructions that summary judgment be entered in their favor and that Linzey be included as a party named in the injunction. We will remand the claim asserted by Donovan to the District Court with instructions that it be dismissed as moot.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*